COPY

Juliano Magnonn Bersani
Rua Thomaz Otto # 128
Pilarzinho, Curitiba
Brazil
CEP 82100520
Telephone: 41-963-50692

ORIGINAL
FILED

JUL 2 0 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

IN RE
FACTOR VIII OR IX CONCENTRATE BLOOD
PRODUCTS LITIGATION

**MEJ**

**C 07 3760**

JULIANO MAGNONN BERSANI, an individual,
citizen of Brazil,

.Plaintiff

v.

BAYER CORPORATION, an Indiana corporation,
successor to CUTTER BIOLOGICAL, a California
Corporation; BAXTER HEALTHCARE
CORPORATION, a Delaware corporation, and its
HYLAND DIVISION; BAXTER
INTERNATIONAL, INC., a Delaware corporation,
successor to IMMUNO-U.S., INC., a Michigan
Corporation; BAXTER WORLD TRADE
CORPORATION, a Delaware corporation;
ARMOUR PHARMACEUTICAL COMPANY,
INC., a Delaware corporation; AVENTIS
BEHRING LLC, a Delaware corporation, and
AVENTIS INC., a Pennsylvania corporation; and
ALPHA THERAPEUTIC CORPORATION, a
California corporation,

Defendants.

Case No.

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

Jury Trial Demanded

(1) Fraudulent Omission and
    Concealment
(2) Breach of Implied Warranty
(3) Negligence
(4) Negligence Per Se

720327.1

## I.    **INTRODUCTION**

1.    Defendants manufactured blood products known as "Factor VIII" and "Factor IX" for the treatment of hemophilia, and sold these products to people with hemophilia in Brazil and other foreign markets, despite knowledge that the products were manufactured from sick, high-risk donors known to be contaminated with the viruses that cause the Human Immunodeficiency Virus and Hepatitis C (now known as "HIV" or "HIV/AIDS" and "HCV" respectively).  As discussed more fully in paragraphs 65– 71, Defendants continued selling these products to people with hemophilia in Brazil and elsewhere even after the products ceased being sold in the United States due to the known risk of HIV/AIDS and HCV transmission. Defendants refused to recall old stocks of products they knew to be contaminated with HIV and HCV even after they had introduced a safer product.

2.    Defendants manufactured HIV and HCV-contaminated blood factor products at plants in the United States using human plasma taken from thousands of paid American donors, including populations then known to be at high risk of carrying blood-borne diseases, such as urban homosexuals, prisoners, and intravenous drug users.  Defendants intentionally recruited urban homosexuals who had a history of viral hepatitis as plasma donors, despite regulations prohibiting the use of such donors and despite knowledge that the viruses that cause HIV/AIDS and HCV were blood-borne diseases prevalent in such populations. Defendants continued using plasma taken from high-risk prison donors even after promising the FDA that they would cease doing so.  Through their trade associations, Defendants actively conspired to conceal these practices and to substantially delay product recalls and implementation of safety measures.

3.    Defendants failed to fully and completely disclose the known risks of their products, including the risk of HIV/AIDS and HCV; failed to implement readily available screening tests that would have prevented HIV/AIDS and HCV by excluding contaminated plasma; failed to use available methods of treating plasma to kill viruses, including heat

-1-

treatment and solvent detergent; and concealed and affirmatively misrepresented the extent of the health dangers of the diseases caused by the products. For example, Defendant CUTTER BIOLOGICAL internally expressed a belief in the danger of HIV/AIDS transmission through their untreated factor concentrate products, while publicly stating to foreign distributors and treaters that concerns over such infections were nothing more than unsubstantiated speculations. Defendants continued to ship untreated product to Brazil and other foreign markets even after introducing a safer product in the United States, in order to maintain their profit margin on existing contracts and sell off remaining stock no longer marketable domestically. Defendants also continued to sell old stocks of product that had not been treated with solvent detergent abroad, including stocks that Defendants knew or had reason to know were made from pooled blood contaminated with HCV, even after introducing a safer product treated with solvent detergent.

4.      Defendants' efforts to maximize profits came at the expense of the health and lives of thousands of people with hemophilia in foreign countries who were needlessly infected with HIV/AIDS and HCV, including JULIANO MAGNONN BERSANI.

## II.      JURISDICTION AND VENUE

5.      Plaintiff allege an amount in controversy in excess of $75,000, exclusive of interest and costs. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and the Defendants.

6.      Plaintiff is informed and believes and upon such information and belief alleges that the unlawful, negligent and/or tortious activity alleged herein was carried out predominantly in the United States. Defendants recruited high-risk paid donors in the United States and mixed plasma from such donors into the blood pool at their facilities in the United States. Defendants placed misleading labels on their products in the United States and made affirmative misrepresentations regarding their products' safety in the United States, which were relied upon by Plaintiff and his medical providers. Defendants' decisions to recruit paid donors from high-risk populations, to refrain from disclosing the known risks of their products, to forego

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

implementing readily available procedures that would have prevented their products from transmitting HIV/AIDS and HCV, and to ship their products to Brazil and other foreign markets even after they could no longer be marketed domestically were all made in the United States. Defendants' acts of conspiracy, including trade association meetings where they agreed to engage in wrongful conduct, also took place in the United States.

7.      Plaintiff is informed and believes and upon such information and belief alleges that the vast majority of the evidence of the unlawful activity alleged herein is located in the United States.  Documents showing Defendants' policies, practices, and decisions regarding recruitment of plasma donors, pooling of plasma at their facilities, labeling of their products, advertising and promotion of their products, disclosure or lack thereof of the risks posed by their products, implementation or lack thereof of procedures to prevent their products from transmitting HIV/AIDS and HCV, and shipment of their products to Brazil and other foreign markets are located almost exclusively in the United States. The vast majority of witnesses who will testify to these policies, practices, and decisions are also located in the United States, and would not be subject to subpoena in other countries.  The expert witnesses likely to be presented by both Plaintiff and Defendants are also located in the United States.

8.      Witnesses to the Plaintiff's damages, such as the Plaintiff's family members, are willing to travel to the United States to testify.

9.      Because the vast majority of documentary and testimonial evidence is located in the United States, litigation in Plaintiff's home country would be costly and inefficient. In addition, Brazil is an inadequate alternative forum because of chronic and lengthy court delays and lack of subpoena power over physical evidence in the United States.

10.      Plaintiff is informed and believes and upon such information and belief alleges that Defendants' unlawful activity was carried out, in significant part, in the Northern District of California. Defendant CUTTER BIOLOGICAL ("CUTTER"), the predecessor of Miles, Inc. and Defendant BAYER CORPORATION ("BAYER"), had its headquarters in Berkeley, California at all pertinent times. CUTTER's Biological Management Committee met

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

720327.1

at its Berkeley headquarters, and it was at its Berkeley headquarters that the decisions were made to recruit high risk homosexual donors from cities in California, including San Francisco's drug-ridden Tenderloin neighborhood, and to ship blood products overseas. In addition, at all times pertinent, Defendant BAXTER CORPORATION, and/or its HYLAND DIVISION, had its main manufacturing plant in Glendale, California. HYLAND's President, Medical Director, and Head of Donor Recruitment all had their offices in the Glendale facility. Defendant BAXTER, and/or its HYLAND DIVISION, also recruited all their homosexual donors from California, particularly from San Francisco and Los Angeles. All Defendants obtained plasma from plasma collection centers located in San Francisco and Oakland.

11.    Plaintiff is informed and believes and upon such information and belief alleges that the evidence of Defendants' unlawful activity is located, in significant part, in the Northern District of California, where much of the unlawful activity was carried out. The majority of documentary evidence on liability is located in a facility in San Jose.

12.    Plaintiff is informed and believes and on such information and belief alleges that the conduct by Defendants that is relevant to the subject matter of this action took place primarily in their respective headquarters locations, or in other facilities within the States of California and Illinois, giving these states significant contacts to the claims asserted by Plaintiff and creating state interests such that the choice of either or each of these states' laws to govern the adjudication of this action is neither arbitrary nor fundamentally unfair, and Plaintiff hereby consent thereto.

## II.    PARTIES

13.    Plaintiff JULIANO MAGNONN BERSANI, a resident of Curitiba, Brazil who has hemophilia, was infected with HCV as a result of infusing Defendants' contaminated factor concentrate and/or as a result of Defendants' conspiracy. Plaintiff's confidential Preliminary Patient Profile Form (PPF) contains substantial additional information regarding Plaintiff's claim.

14.    Plaintiff would not have chosen to be treated with Defendants' blood

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

products had he known of or been informed by Defendants of the true risks of using those products or the nature of the sources of the blood products.

15.    Defendant CUTTER, the predecessor of Miles, Inc., and Defendant BAYER, was a California corporation headquartered in Berkeley, California at all pertinent times. At all pertinent times CUTTER and its successors Miles, Inc. and BAYER regularly and systematically engaged in the harvesting and collection of human plasma and the processing, manufacturing, marketing, sale and distribution of anti-hemophilic factor (hereinafter referred to as "AHF") produced from such plasma, to which Plaintiff was exposed and which contributed directly or indirectly to Plaintiff's infection with HCV.

16.    Defendant BAYER, formerly Miles, Inc., is and was an Indiana corporation, authorized to do business in all 50 states and the District of Columbia. Miles, Inc. had its principal place of business operation in Elkhart, Indiana, while its successor BAYER has its principal place of business in Pennsylvania, with offices located at 100 Bayer Road, Pittsburgh, Pennsylvania, 15205. At all pertinent times BAYER and its predecessors Miles, Inc., and CUTTER regularly and systematically engaged in the harvesting and collection of human plasma and the processing, manufacturing, marketing, sale and distribution of anti-hemophilic factor (hereinafter referred to as "AHF") produced from such plasma, to which Plaintiff was exposed and which contributed directly or indirectly to Plaintiff's infection with HCV.

17.    Defendant BAXTER HEALTHCARE is a Delaware corporation, authorized to do business in all 50 states and the District of Columbia, with its principal place of business in Illinois, with offices located at One Baxter Parkway, Deerfield, Illinois, 60015. At all times pertinent, Defendant BAXTER HEALTHCARE, and/or its HYLAND DIVISION, had its main manufacturing plant in Glendale, California.  At all times pertinent, Defendant BAXTER HEALTHCARE, and/or its HYLAND DIVISION, and/or its wholly owned subsidiaries Travenol Laboratories and Fenwal Laboratories, regularly and systematically engaged in the harvesting and collection of human plasma and the processing, manufacturing, marketing, sale and distribution of AHF products produced from such plasma, to which Plaintiff was exposed

- 5 -

720327.1

and which contributed directly or indirectly to Plaintiff's infection with HCV.

18.    Defendant BAXTER INTERNATIONAL, along with its principal subsidiary Defendant BAXTER WORLD TRADE, is a Delaware corporation and is owner and successor in interest to Immuno International A.G., and IMMUNO-U.S. (described hereinafter collectively as, "IMMUNO"). BAXTER INTERNATIONAL and BAXTER WORLD TRADE have their principal place of business in Illinois, with offices located at One Baxter Parkway, Deerfield, Illinois 60015, and, on information and belief, are the parties liable for the injuries resulting from infusion with Immuno factor concentrates during the relevant period.  In 1997, BAXTER INTERNATIONAL acquired all assets and liabilities of Immuno International A.G., an Austrian company  that at all times pertinent sold AHF products to Brazil and other foreign markets that were produced from human plasma derived from paid donors in the United States. Immuno International A.G. operated in the United States at all times pertinent through its wholly owned American subsidiary IMMUNO-U.S., located in Rochester, Michigan.  IMMUNO operated 15 processing centers in the United States in the 1980s, which collected plasma from high-risk donors for fractionation in plants located in Rochester, Michigan and Vienna, Austria. These products were then shipped all over the world, and contributed directly or indirectly to Plaintiff's infection with HCV.  IMMUNO's product names, Bebulin, Feiba, and Prothromplex, are listed as BAXTER INTERNATIONAL products in the 2003 Registry of Factor Concentrates published by the World Federation for Hemophilia.

19.    IMMUNO-U.S. was a Michigan corporation and was at all pertinent times a United States-based operating subsidiary of Immuno International A.G. The most recent corporate filing for IMMUNO-U.S. is the 1998 certificate of merger filed by BAXTER, listing the principal place of business for the surviving entity as One Baxter Parkway, Deerfield, IL, 60015, the same address for Defendants BAXTER INTERNATIONAL, BAXTER WORLD TRADE and BAXTER HEALTHCARE.

20.    Defendant ARMOUR PHARMACEUTICAL COMPANY, INC., is a Delaware corporation, authorized to do business in all 50 states and the District of Columbia,

720327.1

with its principal place of business in Pennsylvania, with offices located at 500 Arcola Road,

P.O. Box 1200, Collegeville, Pennsylvania, 19426-0107. In 1996 Defendant ARMOUR merged

with Behringwerke A.G., a German company that at all times pertinent sold AHF products which

were produced from human plasma derived from paid donors in the United States, to form

Defendant AVENTIS BEHRING LLC, formerly Centeon Bio-Services, Inc., a Delaware

company with offices located at 1020 First Avenue, King of Prussia, Pennsylvania, 19406.

Defendant AVENTIS BEHRING LLC and its predecessors, Centeon Bio-Services, Inc. and

Armour Plasma Alliance, Inc., are wholly owned subsidiaries of Defendant AVENTIS INC.,

formerly Rhone-Poulenc Rorer International, Inc., formerly Rorer Group, Inc., a Pennsylvania

corporation authorized to do business in all 50 states and the District of Columbia, with offices

located at 300 Somerset Corporate Boulevard, Bridgewater, New Jersey, 088907. At all times

pertinent, Defendants ARMOUR PHARMACEUTICAL COMPANY, INC., AVENTIS

BEHRING LLC, and AVENTIS INC., (all of whom are described hereinafter collectively as

"ARMOUR") regularly and systematically engaged in the harvesting and collection of human

plasma and the processing, manufacturing, marketing, sale and distribution of AHF products

produced from such plasma, to which Plaintiff was exposed and which contributed directly or

indirectly to Plaintiff's infection with HCV.

      21.    Defendant ALPHA THERAPEUTIC CORPORATION (hereinafter

"ALPHA") is a California corporation authorized to do business in all 50 states and the District

of Columbia, with its principal place of business in California, with offices at 5555 Valley

Boulevard, Los Angeles, California, 90032. At all times pertinent Defendant ALPHA has been

regularly and systematically engaged in the harvesting and collection of human plasma and the

processing, manufacturing, marketing, sale and distribution of AHF products produced from

such plasma, to which Plaintiff was exposed and which contributed directly or indirectly to

Plaintiff's infection with HCV.

      22.    Defendants CUTTER, ARMOUR, BAXTER HEALTHCARE, BAXTER

INTERNATIONAL, IMMUNO, (BAXTER HEALTHCARE, BAXTER INTERNATIONAL,

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

BAXTER WORLD TRADE and IMMUNO shall hereinafter be collectively referred to as "BAXTER") and ALPHA (herein collectively identified as "MANUFACTURERS" or "DEFENDANTS") acting on behalf of themselves and/or their predecessor and/or successor corporations, collected, harvested and/or processed human plasma and/or manufactured, marketed, sold and distributed factor concentrate products to Brazil and other foreign markets that were contaminated with HIV/AIDS and/or HCV. In the alternative, one or more of said Defendants participated in the collection, harvesting and/or processing of human plasma and/or the manufacturing, marketing, distribution and sale of factor concentrate products to Brazil and other foreign markets, or assumed, became or are responsible for the liabilities of the Defendants and their predecessor or successor corporations who did participate in the collection, harvesting and/or processing of human plasma and/or the manufacturing, marketing, distribution or sale of factor concentrate products to Brazil and other foreign markets, without limitation thereto.

      23.    At all times herein mentioned, all Defendants and each of them, were fully informed of the actions of their agents and employees, and thereafter no officer, director or managing agent of Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions, and all Defendants and each of them, thereby ratified those actions.

## III.    FACTUAL ALLEGATIONS

### A.    Hemophilia and Its Treatment

      24.    Hemophilia is an inherited condition that causes uncontrolled hemorrhaging or bleeding. Hemophilia results from a deficiency of blood components essential for coagulation. The most common form of the disease is hemophilia A, characterized by a lack of a blood protein known as Factor VIII, which affects approximately one in 10,000 males. Factor VIII is commonly called "AHF," or anti-hemophilic factor. Hemophilia B is characterized by absence of another blood protein, known as Factor IX, affecting about one in 40,000 males. Plaintiff JULIANO MAGNONN BERSANI has severe hemophilia A

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

720327.1

25.     The treatment of hemophilia involves intravenous introduction, called infusion, of the missing blood proteins required to stop bleeding. The two most prevalent forms of such treatment are cryoprecipitate and factor concentrates.  Factor concentrates are the product made by Defendants in this action. Cryoprecipitate is made by freezing plasma, the fluid component of circulating blood in which various proteins, including Factor VIII and Factor IX, are contained; thawing the frozen plasma; and isolating Factor VIII from the plasma through centrifugal concentration. Cryoprecipitate is an effective therapeutic agent for patients with hemophilia A. Hemophilia B has been effectively treated with the use of fresh frozen plasma containing Factor IX. Cryoprecipitate and fresh frozen plasma are made from small numbers of donors, who are generally unpaid volunteers.

26.     By contrast, Defendants in the late 1960s to early 1970s began to market factor concentrates, or AHF, which contained Factor VIII and Factor IX in higher concentrations than had been available in either cryoprecipitate or fresh-frozen plasma. To produce factor concentrates, Defendants mixed pools of plasma from five to twenty thousand donors at a time, a substantial percentage of which were paid donors. These large pools were then subjected to chemical process to concentrate Factors VIII and IX.

**B.      Even Before the Discovery of HIV and AIDS, Defendants Failed to Disclose or Warn of Serious Adverse Effects Associated with Factor Concentrates**

27.     Shortly after the initial commercial marketing of Factor VIII and IX concentrates in the late 1960s to early 1970s, a wide range of serious adverse effects were reported in association with these products. Even before the dissemination of HIV, Defendants knew of serious diseases caused by unidentified agents transmissible by blood and Factor VIII and IX. Defendants failed to warn Plaintiff or the medical community of these adverse effects, in violation of industry standards and federal regulations.

28.     By 1976, only a few years after Defendants' factor concentrate products went on the market, the United States Food and Drug Administration ("FDA") Bureau of Biologics held a conference titled *Unsolved Therapeutic Problems in Hemophilia*. The research

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

articles compiled from the conference discussed the high incidence in patients using Defendants' products of disorders such as liver dysfunction, enlarged spleen, Hepatitis B, and Non-A, Non-B Hepatitis ("NANB Hepatitis," later renamed Hepatitis C). The articles concluded that these disorders were tied to the patients' use of factor concentrates and emphasized the risks entailed in producing such concentrates using plasma from paid donors. As described below, however, Defendants not only refused to implement a voluntary donor system, but instead recruited paid donors precisely because their hepatitis exposure resulted in plasma from which Defendants could make other commercially valuable products as well.

29.     Several of the articles from the 1976 conference also raised alarm over the unprecedented convergence of immune disorders in the hemophiliac community and called for close medical monitoring of the situation.

30.     At all times material to this Complaint, Defendants failed to adequately warn Plaintiff or his physicians of these serious adverse side effects. Several such adverse effects, including immunosuppression (suppression of the immune system), were not mentioned at all in the Defendants' package inserts, which were required to disclose adverse reactions pursuant to federal statutes and regulations and applicable standards of care. Although Defendants' inserts mentioned a risk that plasma "may" contain the causative agent of viral hepatitis, the warning was seriously deficient in that: (a) Defendants failed to disclose that the risk of hepatitis was essentially a 100% guarantee due to their practices of using high-risk donors and specifically recruiting for donors who had previously been exposed to Hepatitis B; (b) while "hepatitis" simply means inflammation of the liver, and may be a relatively benign, temporary condition, Defendants failed to warn that some forms of hepatitis transmitted by their products were believed to present a considerable risk of severe liver damage, cirrhosis, and significantly elevated risk of cancer; (c) Defendants misleadingly stated that the source plasma used in preparation of the product had been found to be non-reactive for Hepatitis B surface antigen (HBsAg)—implying that no viral hepatitis was present in the plasma—and falsely stated that available methods were not sensitive enough to detect all units of potentially infectious plasma,

- 10 -

while failing to disclose that Defendants had refused to implement the more sophisticated Hepatitis B Core antibody (HBc) test which would have excluded essentially all plasma contaminated by Hepatitis B; and (d) Defendants' labeling disclosed that the product was made from large pools of fresh human plasma, but failed to disclose that paid donors increased the risk of disease, and that the particular groups of paid donors targeted by Defendants were known to be the highest risk groups.

**C.    Defendants Recruited Plasma Donors from High-Risk Populations to Manufacture Factor VIII and IX**

31.    The demand for and supply of anti-hemophilia factor rapidly increased during the 1970s with the commercially-manufactured concentrate accounting for a large proportion of the increase in supply. In 1977, a federal report projected that the volume of AHF manufactured would increase substantially by 1980. Division Of Blood Diseases And Resources, National Heart, Lung And Blood Institute, *Study to Evaluate the Supply-Demand Relationships for AHF and PTC Through 1980* at page 8 (1977); hereinafter "NHLBI Report."

32.    In order to sell more AHF to this growing market, Defendants turned to the fastest and cheapest way of obtaining sufficient plasma, paid donors. Defendants recruited paid donors from those populations most likely to respond to the financial incentive to donate: poor inner city residents, drug abusers, prisoners, and residents of impoverished developing countries such as Haiti and Nicaragua.

33.    Defendants purposefully sought out paid donors despite knowing that the risk of diseases transmissible by blood was far greater among paid donors than among volunteers. Because no test was available yet for the NANB Hepatitis virus identified in the early 1970s, an essential means to prevent the virus from contaminating the plasma supply was to exclude donors with behaviors that were inconsistent with good health—precisely those populations from which Defendants were recruiting paid donors. Some studies indicated that paid donors were up to ten times more infectious than volunteer donors. For this reason, the National Blood Policy, adopted by the federal government in July 1973, advocated conversion to

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

720327.1

an all-volunteer blood supply. Defendants, however, not only continued to use paid donors, but also focused their recruiting efforts on the highest risk populations.

34.    Defendants had an additional financial incentive for recruiting paid donors. Factor VIII and Factor IX are only two of many products that can be made for commercial sale from human plasma. According to the NHLBI Report, by the late 1970s at least 17 different therapeutic components of blood were manufactured by the process of "fractionating" plasma into its various elements. The NHLBI Report noted that, "as the costs of fractionation have increased, fractionators have produced as many products as possible from a liter of plasma." *Id.* at 65.

35.    Blood derivatives used as vaccines or therapeutics had particularly high economic value for Defendants. The NHLBI Report noted that plasma with a very high titer, or antibody level, for a corresponding antigen is "very expensive." *Id.* at 41. Such products are manufactured from source plasma drawn from donors who have been sensitized to a particular antigen. *Id.* The NHLBI Report specifically stated, however, that "plasma collected for high antibody titer cannot be used for fractionation into therapeutic products," such as Defendants' factor concentrate. *Id.* (emphasis added).

36.    Defendants targeted donors with high titers to Hepatitis B antigens in order to manufacture and sell Hepatitis B immunoglobulin (HBIG), a product that confers temporary immunity to the Hepatitis B virus. Despite the warning in the NHLBI report, Defendants' used the same high-titer plasma they obtained for making HBIG to manufacture the Factor VIII and IX products used by people with hemophilia. Defendants thus sought to maximize profits by producing "as many products as possible from a liter of plasma," while ignoring industry standards that precluded the use of high-titer plasma for other therapeutic products.

37.    Beginning in about 1978, Defendants BAXTER, CUTTER and ALPHA began targeting homosexual donors in known urban gay communities. Because urban homosexuals had been reported in the 1970s to have exceptionally high prevalence of Hepatitis

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

B infection, Defendants knew that such donors would provide a reliable source of plasma for the manufacture of commercially valuable HBIG.

38.     It was also well-known in the public health community by the 1970s that urban homosexuals engaged in promiscuous sexual practices that rapidly transmitted other diseases, including NANB Hepatitis, which were transmitted by blood and were believed to have serious adverse consequences. Despite this knowledge, Defendants used the same plasma pool from urban homosexuals to manufacture both HBIG and Factor VIII and IX.

39.     Defendants continued this dual use of high-risk plasma even after federal reports warned of the rapid spread of fatal immunosuppressive disease among the same homosexual population from which Defendants heavily recruited. Defendants knew or should have known by no later than the summer of 1981 that urban homosexual males were not "suitable donors" within the meaning of federal regulations and/or other applicable standards of care.

40.     By the 1970s, it was also well-established that plasma from prison populations carried a high risk of hepatitis and other blood-borne diseases, primarily because of the concentration of intravenous (IV) drug users in prisons. Despite knowledge of this risk, Defendants actively recruited prisoners for plasma used to manufacture Factor VIII and IX, while concealing or failing to disclose the risk to Plaintiff, his physicians, or the FDA.

41.     In light of Defendants' special knowledge of the disease patterns among urban homosexuals and prisoners, and their recruitment of such donors for Factor VIII and IX manufacture, Defendants had duties to: (a) promptly investigate the first reports of opportunistic infections among urban homosexuals in 1981; (b) discontinue the practice of using such high risk donors; (c) disclose the risk to Plaintiff, his physicians, and the FDA, including the ongoing risk of continuing to use Factor VIII and IX previously manufactured with high risk plasma and still marketed to patients; (d) implement procedures to kill blood-borne diseases in the products; and (e) recall existing products from distribution or further use. Instead, Defendants continued to conceal their recruitment of high-risk donors and resist warnings and recalls, and failed to

- 13 -

implement procedures to make their products safe.

**D.**    **Defendants Failed to Use the Available Hepatitis B Core (HBc) Test to Exclude Plasma from High Risk Donors**

42.    By no later than 1978, Defendants knew of the availability of a new test to determine whether an individual had a history of viral hepatitis, which would have disqualified the donor from providing plasma for the manufacture of Factor VIII or IX. By testing a person's serum for the presence of the core to the Hepatitis B antibody, a history of viral hepatitis could be verified. This was known as the "HBc test." Published, peer-reviewed literature shows that the HBc test was in use by researchers to determine that homosexual AIDS victims had a history of viral hepatitis by no later than December 1981. Gottlieb, et al., *Pneumocystis Carinii Pneumonia and Mucosal Candidiasis in Previously Healthy Homosexual Men*, 305 New Eng. J. Med. 1425-1431 (1981).

43.    Use of the HBc test would have eliminated approximately 75% of homosexual plasma donors and over 90% of promiscuous urban homosexuals. It would have eliminated almost 100% of intravenous drug users.

44.    Use of the HBc and ALT tests by Defendants by 1981 would thus have eliminated the vast majority of the transmitters of HIV and HCV from the blood and plasma pools of the nation, before the height of the AIDS and Hepatitis C epidemics. If Defendants had implemented this test in a timely manner, Plaintiff would never have been infected with HCV as a result of factor concentrate use.

45.    Plaintiff and thousands of other people with hemophilia in Brazil and other countries became infected by the AIDS and Hepatitis C viruses through repeated exposures to blood products manufactured from large pools of plasma donors (5,000 to 40,000). If Defendants had used the HBc and ALT tests to decrease by 70% to 90% the number of HIV and HCV positive donors who went into a pool, the infectivity of the product would have decreased substantially. Consequently, the rate of infection of people with hemophilia would have slowed down enormously, and the medical and scientific community would have been given more time

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

720327.1

to react appropriately to the HIV and Hepatitis C epidemics.

46.    As noted below, federal regulations required plasma donors to be in good health, and donors with a "history of viral hepatitis" were by definition unacceptable as blood or blood plasma donors. Persons with a history of viral hepatitis were excluded not only because of the risk of transmitting Hepatitis B, but because such a history indicated a lifestyle or previous behavior of the prospective donor which carried the risk of transmitting other viruses in addition to hepatitis. A reasonable and prudent plasma fractionator would not accept a HBc positive donor and expect to be in compliance with federal regulations as of 1978.

47.    After public reports of the first hemophilia AIDS cases in July 1982, government officials urged Defendants to implement the HBc test as a "surrogate" or "marker" to eliminate plasma contaminated by the transmitter of AIDS or Hepatitis C.  HBc testing was also strongly suggested to Defendants by the CDC at a meeting of the United States Public Health Service ("PHS") on January 4, 1983.  Despite this urging, Defendants continued to use contaminated plasma donations that would have been excluded by the HBc test and continued to conceal from Plaintiff, his physicians, and the FDA the dangerous practice of targeting donors at highest risk. At a January 6, 1983 meeting of Defendants' trade association, the Pharmaceutical Manufacturer's Association, Defendants agreed <u>not</u> to implement the highly effective HBc donor screening, and instead opted to use ineffective donor questionnaires that did little to screen out donors at high risk for AIDS and Hepatitis C transmission.

48.    As late as December 13, 1983, years after the HBc test became available, a memorandum from CUTTER's responsible head Stephen Ojala to various CUTTER executives, reporting back on a meeting held by all Defendants, shows that all Defendants conspired to propose a "task force" to further study the use of HBc as an intentional, bad faith "delaying tactic for the implementation" of the test.

E.    **Defendants Also Failed to Implement Available Heat Treatment and Solvent Detergent Treatment to Kill Blood-Borne Diseases**

49.    In the late 1970s and early 1980s, it was recognized that viruses were in

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

720327.1

all AHF products, including Factor VIII and IX. Heat treatment and treatment with solvents and/or detergents were available at that time to eliminate many of these viruses, including HIV and HCV. Defendants were required to take reasonable steps to eliminate contamination, but Defendants failed to utilize these available technologies to eliminate the viruses in a timely manner.

50.     The 1977 NHLBI Report noted that albumin, another plasma product, was "heat-treated to remove almost all danger of hepatitis." *Id.*, at p. 49. Defendant ARMOUR'S memorandum of June 1983 acknowledged that no cases of AIDS had been reported in heat-treated albumin users, but misleadingly stated that heat treatment of Factor VIII and IX was not yet feasible. It was clearly known by no later than 1977 that heat treatment was an effective way to make blood products safer, but Defendants wrongfully refused to implement such procedures for Factor VIII and IX. In 1995, the National Institutes of Health Institute of Medicine ("IOM") issued a report on the hemophilia AIDS epidemic which concluded that Defendants "did not seriously consider alternative inactivation processes," including heat treatment, and that "heat treatment processes to prevent the transmission of hepatitis could have been developed before 1980." Heat-treated, HIV-safe factor concentrates were not introduced by any Defendant until 1983, and were not universally in use until 1985.

51.     In addition to heat treatment, solvent and/or detergent treatment was available to Defendants by the late 1970s as a simple and effective method of eliminating viruses in factor concentrate products. Solvent detergent effectively kills viruses such as HIV and HCV by destroying the viruses' lipid envelope. It is simpler than heat treatment, and unlike heat treatment, does not interfere with the Factor VIII and IX proteins needed for blood clotting.

52.     Solvents and/or detergents were well-known, commercially available products as of the 1970s, and studies in which solvent and/or detergent treatment was used to disrupt viruses were published in the 1970s in peer-reviewed journals. In 1980, Dr. Edward Shanbrom, a former BAXTER scientist, received a patent for a detergent treatment process for viral inactivation of factor concentrate. Dr. Shanbrom describes the implementation of this

- 16 -

720327.1

process as "as easy as washing your hands."

53.    After receiving the patent, Dr. Shanbrom approached Defendants about implementing his method, but Defendants refused to heed Dr. Shanbrom's advice. Defendants refused to even commit any resources to investigate the solvent and/or detergent method.

54.    Defendants were notified of the successful use of organic solvents to destroy lipid viruses, including NANB, in factor concentrates by the New York Blood Center ("NYBC") at the National Hemophilia Federation's meeting on October 27, 1983.

55.    In 1984, Dr. Prince and Dr. Horowitz of the NYBC published the results of their successful use of the solvent detergent process in well-known medical journals. They offered to license the process to Defendants for a reasonable fee. In 1985, the NYBC obtained a license from the FDA to market a solvent detergent inactivated factor concentrate.

56.    By March, 1984, Defendants obtained licenses to sell Factor VIII treated with dry heat to inactivate viruses, and Defendants had obtained such licenses for Factor IX by October, 1984. The FDA did not allow them to label the products as hepatitis safe. By fall of 1984, Defendants were notified by treaters that previously-untreated patients in their clinical trials using its dry heated product developed elevated ALT enzymes, indicative of NANB infections.

57.    Defendants were therefore aware in 1984 that dry heat did not effectively inactivate the virus that causes HCV, and that solvent detergent treatment methods did eliminate the risk of HCV infection, but chose not to employ the effective and efficient solvent detergent technology. Instead, Defendants continued to sell their contaminated dry heat product for at least four more years.

58.    A recent CDC study documents the relative effectiveness of the dry heat and solvent detergent inactivation methods. The study reported that "84% of previously untreated patients infused with dry-heated Factor VIII products developed non-A, non B hepatitis... ." Soucie, Richardson, Evatt et al., *Risk Factor for Infection with HBV and HCV in a Large Cohort of Hemophiliac Males*, 41 Transfusion 338-343 (2001).

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

720327.1

59.    The same CDC study reported that "solvent detergent treatment of blood components [was] found to be more effective against enveloped viruses than heat treatment ... No cases of HBV, HCV, or HIV transmission through solvent detergent virus inactivated products have been found in prospective studies of previously untreated patients..."

60.    The study further reported "in our data, the first dramatic decline in HCV prevalence appears in the 1987 birth cohort. The drop in HCV transmission correlates with the licensing of solvent detergent treatment of Factor IX products in 1987. In addition, this cohort would have been the first to benefit from the screening of blood donors using the surrogate markers ALT (begun in late 1986) and anti-HBc (begun in 1987), testing that was associated with a markedly decreased risk of HCV infection from blood transfusions."

61.    The study states further that "the residual transmissions after 1987 possibly represent the use of product already manufactured or product manufactured during the interval required to implement the new technology. The 18-month shelf life of factor concentrates placed those people with hemophilia born as late as 1989 at risk of infection." The study goes on to recommend testing for all people with hemophilia who received infusions of Defendants' blood products prior to 1992.

62.    By 1988, it was clear to the medical and scientific community what Defendants had long known: dry-heated factor concentrates were transmitting the potentially deadly NANB virus, and safer products were available. This knowledge prompted the CDC to publish information and recommendations that dry-heated products no longer be used by hemophiliacs. Defendants continued sales of their dry-heated products after these warnings, and never undertook a large-scale recall of dry-heated product. Defendants finally introduced solvent detergent-treated products to the market in 1988 and 1989, but continued to sell their NANB-contaminated dry-heated factor concentrates after this date.

63.    The failure of Defendants to implement solvent and/or detergent viral inactivation techniques in a timely manner, to warn of the risk that heat treated Factor VIII and IX blood products could transmit HCV, and to recall heat treated products that posed this risk

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

caused the needless infection of thousands of people with hemophilia with HCV, including

Plaintiff. Even after Defendants knew or should have known that solvent and/or detergents

effectively destroyed HCV, they continued to sell heat treated Factor VIII and IX, and refused to

recall these dangerous products from the market.

**F.    Defendants Continued to Allow the Sale of Non-Heat Treated Factor
Concentrate Products Abroad Even After They Stopped Selling Non-Heat
Treated Product in the United States**

64.    Between 1983 and 1985, Defendants stopped selling non-heat treated

factor concentrate in the United States and introduced a vastly safer heat-treated version.

However, one or more Defendants, including BAXTER/IMMUNO continued to ship their

remaining stocks of non-heat treated product abroad to Brazil and other countries after ceasing

sales of such product in the United States, despite knowledge that the non-heat treated product

was contaminated with HIV and/or HCV.

65.    As detailed herein, by the end of 1982 Defendants' internal

communications in the United States revealed their awareness of the AIDS risk posed by their

products, but they continued to disavow the connection between AIDS and factor concentrates in

their communications to foreign doctors and persons with hemophilia. In mid-1983, for example,

months after CUTTER executives authored internal memos expressing their belief that factor

concentrates transmitted AIDS, the company wrote a letter to its foreign distributors in which it

characterized the concern over AIDS as an "irrational response," and dismissed the notion that

AIDS could be transmitted by factor concentrates as "unsubstantiated speculation." Internal

CUTTER document. CUTTER told the distributors that "[w]hat little evidence exists . . . tends

to suggest that AHF concentrates have no direct role in [the AIDS] syndrome." Similarly,

CUTTER told foreign hemophilia treaters in late 1983 that transmission of AIDS through factor

concentrates "has not been medically linked." Internal CUTTER document.

66.    CUTTER also disputed the safety of heat-treated products in its

representations to the foreign hemophilia community, at the same time that it worked furiously to

introduce its own heat-treated product. In its letter to foreign distributors, CUTTER stated that

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

"it would be of questionable value for hemophilia patients to be persuaded to change to" heat-treated products because there is "no guarantee of increased protection . . . . [I]t is more desirable to prevent the introduction of a possible AIDS agent in the starting material than to attempt to eliminate it with unproven procedures at a later stage in the process." Internal CUTTER document.

67.    Once CUTTER had introduced its own heat-treated Factor VIII in early 1984, however, it did not hesitate to tout heat treatment as a safer alternative, circulating data showing its effectiveness in killing model viruses to its customers. Defendants' shipping records, however, indicate that they did not cease sales of their contaminated non-heat treated ("non-HT") product in other countries after introducing this safer alternative. In fact, Defendants sought to undermine attempts by foreign governments to ban their non-HT products.

68.    In October of 1984, the CDC issued a report announcing that 74% of recipients of Factor VIII concentrates made from plasma derived from American donors were HIV positive. The CDC report also publicized studies showing that CUTTER's heat treatment process effectively killed the HIV virus.

69.    Even after this report, however, Defendants failed to withdraw their non-HT factor from Brazil and other foreign countries in favor of heat-treated product. The CDC report also publicized studies showing that heat treatment effectively killed the HIV virus. Upon information and belief, Defendants did not upon receiving this news recall or withdraw their unheated products from Brazil. Such products therefore remained on the shelves and continued infecting Brazilian hemophiliacs until their expiration dates. Upon information and belief, IMMUNO dumped unheated factor concentrates to Brazil until at least mid-1985, and these products caused HIV infections in Brazilian hemophiliacs into 1987, three years after IMMUNO had introduced a heat-treated, HIV safe product.

70.    Defendants finally withdrew non-HT factor from the United States in mid-1985 as a result of pressure from the FDA, but failed to do the same in Brazil and elsewhere. As a result, persons with hemophilia in Brazil continued to use non-HT factor long after Defendants

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

first made heat-treated factor available to American persons with hemophilia, causing numerous

needless infections and deaths.

G.    **Defendants Fraudulently Misrepresented the Safety, and Concealed the
      Dangers, of Their Factor VIII and IX Products.**

71.    Defendants engaged in a pattern and practice of fraudulent concealment of

their dangerous practices, fraudulent misrepresentations of the extent of their efforts to assure

safety, and fraudulent misrepresentations that understated the risk of AIDS and Hepatitis C, in

order to maintain profits from both factor concentrates and HBIG. A summary of Defendants'

fraudulent misrepresentations and concealment is set forth below.

72.    On July 27, 1982, a meeting of the Public Health Service was held as the

result of the CDC's report of three people with hemophilia who contracted AIDS. The

responsible heads of ARMOUR, ALPHA, CUTTER and BAXTER were in attendance, along

with officials from the National Hemophilia Foundation, CDC and FDA. At least three of the

Defendants were aware that they had used plasma from known, targeted homosexuals in the

manufacture of Factor VIII and IX blood products. These products had a shelf life of two and

three years, respectively, and were either in production or already on the shelves in pharmacies

waiting to be infused by people with hemophilia who purchased them. The Defendants involved,

CUTTER, BAXTER and ALPHA, failed to disclose these facts at the meeting, despite

knowledge that the CDC's primary concern at that meeting was the contamination of Factor VIII

and IX by the transmitter of AIDS, which was already well-known to be epidemic in the targeted

homosexual population. CUTTER memorandum dated August 3, 1982.

73.    In or about December, 1982, Michael Rodell, the responsible head for

BAXTER, entered into an agreement with officials of the FDA to the effect that BAXTER would

no longer use prison plasma in the production of factor concentrates. In fact, BAXTER,

unbeknownst to the FDA, continued to use prison plasma in factor concentrate production

through October 1983.  BAXTER memorandum dated October 20, 1983.

74.    On January 5, 1983, an AIDS meeting was held at Children's Orthopedic

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

720327.1

Hospital in Los Angeles, California, the largest hemophilia treatment center in the United States. Representatives of four Defendants were present at the meeting with treaters and patients. The purpose of the meeting was to have Defendants' representatives answer patients' questions about AIDS transmission through factor concentrates. A patient asked representatives from CUTTER, ALPHA, ARMOUR and BAXTER the following question: "Is the plasma from homosexuals, prisoners, Haitians or other high risk persons being used in the manufacture of concentrates?" No Defendants admitted targeting or using plasma from homosexuals, prisoners or inner city IV drug abusers. Dr. Goodman from BAXTER answered regarding BAXTER'S use of known homosexuals as follows: "We are changing the nature of questions to homosexuals to the best of our ability." CUTTER'S responsible head, Stephen Ojala, an ALPHA representative, and ARMOUR'S Karl Hansen made no response to the question. This partial and misleading response amounted to concealment of the true risk created by the use of plasma from known homosexuals, IV drug abusers and prisoners in the manufacture of factor concentrates.

75.     At the January 5, 1983 meeting, and in the presence of the patients, one of the treating physicians, Dr. Kasper, asked CUTTER'S Stephen Ojala: "These [plasma] centers seem to be in rundown centers of town. Is there a move to move them to rural towns?" Ojala answered: "Many of the centers are in smaller communities and in towns such as Ypsilanti, Seattle, Clayton, NC, and San Diego. We do not have centers in L.A. or San Francisco." This answer was misleading because Ojala failed to state that CUTTER'S largest and first plasma center was located at Arizona State Penitentiary. CUTTER also had a center at the Las Vegas Prison. Ojala and CUTTER were well aware of the CDC's and FDA's concern over use of prison plasma, due to homosexual practices and drug abuse in the prison donor population. Many of CUTTER'S centers were in inner city areas frequented by IV drug abusers, such as downtown Oakland, California. CUTTER had also used plasma from centers which targeted known homosexuals. In August 1982, CUTTER quarantined plasma from the Valley Medical Center, a center which targeted known homosexuals, because a donor was hospitalized with full blown AIDS. The plasma was intended for Factor IX and HBIG production, but was not used because it

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

had thawed on the way to the processing plant. Upon receiving a report of this incident from

CUTTER, the FDA indicated a recall might have been necessary if the plasma had been

incorporated into factor concentrate final product. Ojala omitted any mention of these facts and

circumstances in his response to Dr. Kasper regarding the location of their plasma centers.

CUTTER memorandum dated January 5, 1983.

      76.    On January 14, 1983, Rodell and the other responsible heads from

Defendants attended a meeting of the National Hemophilia Foundation ("NHF"). The purpose of

the meeting was to have Defendants explain to the NHF what steps they were prepared to take to

safeguard the plasma supply from potential AIDS transmitters. Defendants were very concerned

that the NHF would insist on a recommendation that HBc testing be implemented, consistent

with the CDC recommendation 10 days earlier. BAXTER, under Rodell's supervision, had

already conducted a survey of several of their donor centers to determine how many donors they

would lose if the test were implemented. BAXTER had decided that up to 16% of their donors

would not pass the test. Further, BAXTER'S high-titered immunoglobulin donors would be

eliminated. In order to defer an NHF recommendation that HBc testing be used, Rodell told NHF

officials that surrogate testing was in the "R and D," or "Research and Development," stage

currently. Rodell concealed the fact that the CDC had strongly recommended use of the HBc

antibody test as a screening device for donors at high risk for AIDS transmission. The HBc

antibody test was not in the "R and D" stage, and was suitable for use as a screening device for

high risk AIDS and Hepatitis C donors. In fact, the HBc test had been approved in 1979 by the

FDA as a diagnostic test to be used to ascertain a history of previous Hepatitis B infection, and

as a screening device for blood and plasma donors. The test had the capability of identifying

donors with a history of viral hepatitis. Donors with a hepatitis history were specifically

prohibited pursuant to the federal regulations (21 C.F.R. § 640.63). Rodell acknowledged that

implementation of the HBc test would eliminate high-titered immunoglobulin donors, but failed

to disclose that opposition to use of the test was based on economic rather than safety concerns.

      77.    At the January 14, 1983 meeting, ALPHA, CUTTER and BAXTER

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

concealed their advertising in publications distributed among urban homosexuals, for the specific

purpose of attracting them to plasma centers which supplied high titered plasma to the

Defendants. CUTTER and ALPHA concealed their extensive use of prison plasma, and

BAXTER discussed plans to phase out prison plasma during the coming year. However, none of

the Defendants revealed their "gentlemen's agreement" with the FDA to discontinue use of these

plasma sources immediately. CUTTER memorandum dated January 17, 1983.

        78.     On or about December 15, 1983, Rodell, then the head of ARMOUR, told

members of the federal Blood Product Advisory Committee (BPAC) and FDA officials that the

Defendants wanted a three-month deferral in implementation of any recommendations by the

BPAC or FDA that HBc testing be required for plasma donors. Rodell told the FDA that the

purpose of the deferral was to prepare a response to the proposed recommendation. In fact, the

Defendants had agreed to seek the three-month hiatus as a "delaying tactic" against

implementing the test, and the request for a deferral was made in bad faith. CUTTER

memorandum dated December 13, 1983.

        79.     It was strongly suggested by the CDC on July 27, 1982, that AIDS had a

viral etiology similar to Hepatitis B because of the risk groups involved. These risk groups

comprised a substantial portion of CUTTER'S plasma donor sources. CUTTER took no

meaningful action to screen out donors at the highest risk for AIDS and Hepatitis C transmission

at any time during the epidemic. In fact, they continued to market products containing plasma

from these groups throughout 1982, 1983 and 1984 worldwide. Even more egregiously,

CUTTER and other Defendants continued to market high-risk non-heat treated factor concentrate

abroad after ceasing sales of such product in the United States in favor of vastly safer heat

treated product.

        80.     Defendants, jointly and individually, fraudulently misrepresented the risk

of AIDS and Hepatitis C due to factor concentrates, failed to disclose accurate warnings of the

risk to Plaintiff or his physicians, and fraudulently purported to be doing "everything possible" to

improve safety, when in fact Defendants maximized the risk by recruiting high-risk donors and

**COMPLAINT FOR DAMAGES**
**AND INJUNCTIVE RELIEF**

720327.1

by resisting and obstructing HBc testing, heat treatment, and other measures that would truly have reduced the risk.

**H.    Defendants' Activities Were Subject to Applicable Federal Regulations, Which Evidence the Standard of Care With Which Defendants Should Have Complied**

81.    Blood derivatives such as Factor VIII and IX are prescription biologicals subject to federal regulation as both "biological products" and "drugs." Public Health Service Act, Regulation of Biological Products, 42 U.S.C. § 262 (2005); Food, Drug & Cosmetic Act (FDCA), 21 U.S.C. § 301, *et seq.* (2005).

(a)    21 U.S.C. § 331(b) prohibited and continues to prohibit "adulteration or misbranding of any … drug, . . . ."

(b)    21 U.S.C. § 351(a)(2)(B) provided and continues to provide that "[a] drug . . . shall be deemed to be adulterated . . . if . . . the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety. . . ."

(c)    21 U.S.C. § 352 provided and continues to provide that "[a] drug... shall be deemed to be misbranded. .. if its labeling is false or misleading in any particular."

(d)    21 U.S.C. § 352(f)(2) provided and continues to provide that a drug shall be deemed to be "misbranded" unless its labeling bears "adequate warnings against use. .. where its use may be dangerous to health."

(e)    21 U.S.C. § 352(n) provided and continues to provide that a drug shall be deemed to be "misbranded" unless the labeling included information concerning side effects and contraindications as required in federal regulations.

(f)    21 U.S.C. § 321(n) provided and continues to provide that if an article is alleged to be misbranded because the labeling or advertising is misleading, then the determination of whether the labeling or advertising is misleading shall take into account "not only representations made or suggested" by affirmative statements, "but also the extent to which

- 25 -

the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use" of the drug.

82.    At all times material to this Complaint, 21 C.F.R. § 201.57(e) provided and continues to provide as follows, with respect to information to be provided with the sale of Defendants' products:

> Warnings: Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association with a drug; a causal relationship need not have been proved.

83.    At all times material to this Complaint, 21 C.F.R. § 200.5 provided and continues to provide as follows:

> Manufacturers and distributors of drugs and the Food and Drug Administration occasionally are required to mail important information about drugs to physicians and others responsible for patient care. In the public interest, such mail shall be distinctive in appearance so that it will be promptly recognized and read.

84.    At all times material to this Complaint, Part 606 of 21 C.F.R. set forth and continues to set forth "Current Good Manufacturing Practices" for biological products generally, and 21 C.F.R. § 640, *et seq.* set forth additional good manufacturing practices for blood and plasma biologicals.

85.    At all times material to this Complaint, 21 C.F.R. § 606.140(a) provided and continues to provide:

> Laboratory control procedures shall include: The establishment of scientifically sound and appropriate specifications, standards and test procedures to assure that blood and blood components are safe, pure, potent and effective.

86.    At all times material to this Complaint, 21 C.F.R. § 640.60 defined and continues to define "Source Plasma" as:

720327.1

the fluid portion of human blood collected by plasmapheresis and intended as source material for further manufacturing use.

87.    At all times material to this Complaint, 21 C.F.R. § 640.63(c) (1999), titled Qualification of Donor, provided as follows with respect to donors of source plasma:

> Donors shall be in good health on the day of donation, as indicated in part by: . . . (9) freedom from any disease, other than malaria, transmissible by blood transfusion, in so far as can be determined by history and examination indicated in this section; (10) freedom of the arms and forearms from skin punctures or scars indicative of addiction to self-injected narcotics; (11) freedom from a history of viral hepatitis; (12) freedom from a history of close contact within six months of donation with an individual having viral hepatitis; . . . .

Further, 21 C.F.R. § 640.63(a) provided and continues to provide that the method of determining "suitability of a donor" included "tests" as well as the taking of a history and physical examination.

88.    The foregoing statutes and regulations are evidence of the standard of care Defendants should have employed in the manufacture and sale of Factor VIII and Factor IX. Defendants violated the foregoing regulations and/or failed to comply with applicable standards of care by: (a) marketing "adulterated" products that were unsafe as a result of failure to comply with "Current Good Manufacturing Practice"; (b) marketing "misbranded" products that were misleading and failed to disclose or warn of health dangers; (c) failing to warn of serious adverse reactions and potential safety hazards as soon as there was reasonable evidence of an association with the product; (d) failing to exclude intravenous drug users who were unsuitable donors; (e) failing to exclude donors with a history of viral hepatitis who were unsuitable donors; (f) affirmatively seeking out unsuitable donors known to have viral hepatitis antibodies, as well as prison populations known to include substantial numbers of intravenous drug users, for inclusion of their plasma in the pools used to make Factor VIII and Factor IX; (g) failing to disclose their use of dangerous donors; and (h) failing to use appropriate tests and/or procedures to assure the products were safe.

- 27 -

**COMPLAINT FOR DAMAGES**
**AND INJUNCTIVE RELIEF**

I.    **Conspiracy, Concert of Action and Group Liability**

89.    Defendants, and each of them, acted in concert and participated in a conscious and deliberate conspiracy to act negligently, fraudulently and with willful and wanton disregard for the rights and safety of blood product users, in connection with the manufacture of Factor VIII and IX blood products and the collection of constituent plasma.

90.    Defendants herein tacitly and explicitly agreed to avoid upgrading industry standards. For example, the technology to virally inactivate factor concentrates existed in the early 1970s, but was not seriously investigated by any of the Defendants until the early 1980s, despite its effective use in Europe. Use of the HBc antibody test to eliminate Hepatitis B carrier donors, and to identify donors with a history of viral hepatitis, was known science by 1978. The HBc test was reported to be an effective surrogate test for both AIDS transmission and NANB Hepatitis carriers by 1982, yet no Defendant implemented this test until April 1984.

91.    Defendants used donors from predominantly homosexual donor centers, prisons, and inner city areas where the risk of IV drug abuse was high. After July 1982, when the results of this conduct culminated in reports of fatal immune suppression in three people with hemophilia who infused the product, this concert of action took on a more overt, active form.

92.    By December 1982, the FDA demanded that Defendants stop using prisoners, donors from high-risk areas for hepatitis and AIDS transmission, and known homosexuals. Rather than use good faith efforts to comply with the FDA requests, Defendants collectively argued for a far less onerous and less effective donor screening program. At a January 6, 1983 meeting of Defendants' trade association, the Biological Section of the Pharmaceutical Manufacturer's Association ("PMA"), Defendants agreed not to implement highly effective HBc donor screening, instead selecting ineffective donor questionnaires that did little to screen out donors at high risk for AIDS transmission. Defendants further agreed to keep each other informed as to what the other was doing in order that a low standard of care was maintained. HBc testing had been strongly suggested by the CDC at the January 4, 1983 Public

- 28 -

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

Health Service ("PHS") meeting. On January 14, 1983, Defendants acted jointly to persuade the National Hemophilia Foundation ("NHF") not to advocate surrogate testing for AIDS and Hepatitis C through implementation of the HBc test. Defendants persuaded the NHF that use of the HBc test was in the "R and D" stage and not practical to implement at that time.

93.    Defendants jointly agreed to oppose recall of the products beginning at the January 6, 1983 meeting at the Pharmaceutical Manufacturers' Association ("PMA"). Beginning with this meeting and continuing through at least July 19, 1983, Defendants met at various times to prepare a strategy to prevent the FDA from advocating a far-reaching recall of factor concentrate products. Defendants knew that due to their high-risk donor populations, and their combining of these donors in pools of 5,000 to 40,000, their products were contaminated with the AIDS agent. Nevertheless, Defendants acted in concert to lobby the FDA to issue recommendations to limit recalls to circumstances in which an identified donor had died of AIDS within a specified time after the pooling of that donor's plasma. Defendants were well aware that plasma from contaminated asymptomatic donors were mixed in the plasma pools and contaminated virtually all lots. Defendants were successful in deferring any FDA Blood Products Advisory Committee ("BPAC") recommendation for a general recall of the product at the July 19, 1983 BPAC meeting. This joint action allowed Defendants to avoid ever recalling any product except when a donor died of AIDS.

94.    Defendants conducted a meeting on or about January 6, 1983 at the PMA, a major purpose of which was to decide on a unified strategy to deal with increasing knowledge of risk of AIDS. At the meeting Defendants agreed to postpone submitting any request to the FDA for permission to amend their warning labels or package inserts. They further agreed not to apply to the FDA for warnings enhancements until the other three companies agreed to make application for warning enhancements and to make the warnings similar in content. At the time of the meeting, Defendants had been informed by various reliable health authorities, including the PHS, that there was evidence of an association of risk between factor concentrate use and the transmission of AIDS.

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

95.    On December 13, 1983, Stephen Ojala, CUTTER's responsible head, documented by written memorandum that Defendants met and jointly agreed to propose a "study" of the HBc surrogate screening test, as a "delaying tactic" to avoid implementing the HBc test.

96.    Thereafter, at various times throughout 1983-1985, Defendants attended meetings or otherwise communicated to assure joint efforts to avoid recalling their products; to avoid warning patients of the true risk; to boost marketing of their products when sales dropped due to information in the lay press related to AIDS transmission through factor concentrates; to avoid recall of their non-heat treated products after heat-treated products were available; to avoid implementation of the HBc test; and to coordinate a joint legal defense plan in anticipation of litigation from patients afflicted by AIDS through use of their products. Defendants also operated through trade organizations, such as ABRA and PMA, to issue public statements minimizing the risks of AIDS and Hepatitis C and over promoting the benefits of factor concentrate, and to carry out the abovementioned goals of all Defendants.

97.    All of the Defendants likely to have caused the harms to Plaintiff are parties to this lawsuit and properly before the court.

98.    The conduct of each and all of the Defendants, with respect to their Factor VIII and Factor IX products and related plasma collection methods, was tortious.

99.    The harm which has been caused to Plaintiff resulted from the conduct of one, or various combinations of the Defendants, and, through no fault of the Plaintiff, there may be uncertainty as to which one or combination of Defendants caused the harm.

100.    The burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by the Plaintiff.

101.    AHF was manufactured using the same fractionation method by all Defendants. Therefore, during the relevant years from 1975 through 1985, non-heat treated factor concentrates were a fungible product, and physicians prescribed the products interchangeably without regard to brand names of the drugs.

720327.1

102.    The non-heat treated factor concentrates manufactured by Defendants from 1975 until 1985 contained the same design flaws. These products were manufactured from paid donor plasma, which was at highest risk for Hepatitis B, Hepatitis C, and HIV viral transmission. In addition, the products were made from large pools consisting of 5,000 to 40,000 paid donors, which further magnified the risk of viral transmission.

103.    In addition, Defendants' factor concentrate products were similarly misbranded. All of the products failed to warn of the known risks enumerated in this complaint.

## IV.    TOLLING OF APPLICABLE STATUTES OF LIMITATION

104.    Any and all potentially applicable statutes of limitations have been tolled by Defendants' affirmative and intentional acts of fraudulent conduct, concealment, and misrepresentation, alleged above, which estop Defendants from asserting statutes of limitation. Such acts include but are not limited to intentionally covering up and refusing to disclose use of high-risk plasma; selling products abroad known to be contaminated; suppressing and subverting medical and scientific research; and failing to disclose and suppressing information concerning the risks of HIV and HCV transmission from Defendants' contaminated factor concentrate. For example, while the spread of AIDS in homosexuals and IV drug users became known to the FDA and the public, only Defendants knew that these very populations were the donors Defendants were targeting to obtain plasma for their factor concentrate products.

105.    Defendants are estopped from relying on any statutes of limitation because of their fraudulent concealment and misrepresentation alleged above. Defendants were under a duty to disclose the risks of HIV and HCV transmission from their contaminated factor concentrate because this is nonpublic information over which they had exclusive control, because Defendants knew this information was not readily available to people with hemophilia like Plaintiff, and because this information was relevant to people with hemophilia in deciding whether to use Defendants' factor concentrate.

106.    Until very recently, Plaintiff had no knowledge that Defendants were engaged in much of the wrongdoing alleged herein. Because of the fraudulent and active

- 31 -

720327.1

concealment of the wrongdoing by Defendants, including but not limited to deliberate efforts—which continue to this day—to give Plaintiff the materially false impression that Defendants undertook all feasible safety precautions to reduce the risk of HIV and HCV transmission from their contaminated factor concentrates, Plaintiff could not reasonably have discovered the wrongdoing any time prior to this time, nor could Plaintiff have, as a practical matter, taken legally effective action given the unavailability, until very recently, of internal memoranda and other documents (as generally described herein) as evidence in support of Plaintiff's claims. Defendants still refuse to admit and continue to conceal their wrongdoing, and therefore Defendants' acts of fraudulent concealment and misrepresentation continue through the present time.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### FRAUDULENT OMISSION AND CONCEALMENT

107.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further alleges as follows:

108.    Defendants had a confidential and special relationship with Plaintiff due to (a) Defendants' vastly superior knowledge of the health and safety risks relating to Factor VIII and Factor IX; (b) Defendants' sole and/or superior knowledge of their dangerous and irresponsible plasma collection practices; and (c) Defendants' direct communications with the hemophiliac community through newsletters that purported to accurately convey the risk of AIDS. As a result, Defendants had an affirmative duty to fully and adequately warn the hemophiliac community, including Plaintiff and his physicians, of the true health and safety risks related to their Factor VIII and Factor IX blood products and constituent plasma, and a duty to disclose their dangerous and irresponsible plasma collection practices. Independent of any special relationship of confidence or trust, Defendants had a duty not to conceal the dangers of the products to Plaintiff and his physicians.

- 32 -

720327.1

109.    Misrepresentations made by Defendants about the health and safety of their factor concentrate products independently imposed a duty upon Defendants to fully and accurately disclose to the hemophiliac community, including Plaintiff and his physicians, the true health and safety risks related to Factor VIII and Factor IX and its constituent plasma, and a duty to disclose their dangerous and irresponsible plasma collection practices.

110.    In connection with their Factor VIII and Factor IX products, Defendants fraudulently and intentionally concealed important and material health and safety product risk information from Plaintiff, the hemophiliac community, and treating physicians, all as alleged in this Complaint.

111.    Any of the following is sufficient to independently establish Defendants' liability for fraudulent omission and/or concealment:

a.    Defendants fraudulently concealed the health and safety hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with their Factor VIII and Factor IX blood products and related plasma collection activities;

b.    Defendants fraudulently concealed their practice of using unsuitable plasma from unsuitable donors in the manufacture of Factor VIII and Factor IX blood products;

c.    Defendants fraudulently concealed their practice of avoiding the use of available technology to detect viruses in Defendants' blood products and the components thereof;

d.    Defendants fraudulently concealed their practice of avoiding the use of available technology to destroy viruses in Defendants' blood products and the components thereof;

e.    Defendants fraudulently concealed information about the known comparative risks and benefits of the use of Factor VIII and Factor IX and the relative benefits and availability of alternate products and therapies.

112.    Defendants knew that Plaintiff, the hemophiliac community, and his physicians would regard the matters Defendants concealed to be important in determining their course of treatment, including their decision of whether to use Factor VIII and/or Factor IX.

113.    As a direct and proximate result of Defendants' fraudulent concealment and suppression of material health and safety risks relating to Factor VIII and Factor IX and of

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

Defendants' dangerous and irresponsible plasma collection practices, Plaintiff has suffered and will continue to suffer injury, harm and economic loss. As the direct, producing, proximate and legal result of the Defendants' fraudulent concealment and suppression of material health and safety risks relating to Factor VIII and Factor IX and of Defendants' dangerous and irresponsible plasma collection practices, Plaintiff has been injured and has incurred damages, including but not limited to permanent physical injuries to his person, medical and hospital expenses in the past, past disability, past loss of use of the body, and past physical and mental pain and suffering; and will incur in the future medical and hospital expenses, permanent disability, future loss of use of the body, future physical and mental pain and suffering, and loss of life and loss of the enjoyment of life.

114.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

115.    Defendants' conduct, as alleged above, was malicious, intentional and outrageous and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

116.    Plaintiff is informed and believes that Defendants utilize retention policies that provide for scheduled destruction of documents and other items, which may result in the knowing, negligent, or inadvertent destruction of documents, data, and materials relevant and necessary to adjudication of this action, including, but not limited to, records identifying batch or lot numbers of Defendants' products shipped to particular treatment facilities abroad, which may facilitate product tracing. This risk warrants an order from this Court that such evidence (including all documents, data compilations, and tangible things within the meaning of Rule 26 of the Federal Rules of Civil Procedure) be preserved and maintained for use in these proceedings.

## SECOND CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY

118.    Plaintiff incorporates by reference all previous paragraphs of this

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

720327.1

Complaint as if fully set forth here and further alleges as follows:

119.    Defendants' factor concentrate products were intentionally designed, manufactured, promoted, distributed and sold to be introduced into the human body.

120.    Defendants breached the implied warranties of merchantability and fitness because Defendants' factor concentrate products cannot pass without objection in the trade, are unsafe, are not merchantable, are unfit for their ordinary use when sold, and are not adequately packaged and labeled.

## THIRD CLAIM FOR RELIEF

### NEGLIGENCE

121.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further alleges as follows:

122.    Defendants marketed their Factor VIII and/or Factor IX blood products to and for the benefit of Plaintiff, and knew or should have known that Plaintiff would use their Factor VIII and/or Factor IX blood products.

123.    Defendants owed Plaintiff a duty to exercise reasonable or ordinary care under the circumstances in light of the generally recognized and prevailing best scientific knowledge.

124.    Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, the Defendants breached their duty to Plaintiff.  The following sub-paragraphs summarize Defendants' breaches of duty to Plaintiff and describe categories of acts or omissions constituting breaches of duty by Defendants; each and/or any of these acts or omissions establishes an independent basis for Defendants' liability in negligence:

   a.    Failure to exercise reasonable care in producing Factor VIII and Factor IX blood products that were free of viruses, including the HIV virus that causes AIDS and the HCV virus that causes Hepatitis C;

   a.    Failure to exercise reasonable care in assuring that only suitable plasma would be used in manufacturing their Factor VIII and Factor IX blood products;

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

b.   Failure to exercise reasonable care in testing plasma used in manufacturing their Factor VIII and Factor IX blood products for virus contamination;

c.   Failure to exercise reasonable care in recruiting and screening donors of plasma used in manufacturing their Factor VIII and Factor IX blood products;

d.   Failure to reasonably employ anti-viral techniques, including heat treatment, in the manufacture of their Factor VIII and Factor IX blood products;

e.   Unreasonable over promotion of their Factor VIII and Factor IX blood products;

f.   Understating the relative value of hemophilia treatments that constituted alternatives to their Factor VIII and Factor IX blood products;

g.   Failure to warn physicians, Plaintiff, and the hemophiliac community of the dangers associated with their Factor VIII and Factor IX blood products and/or the viruses and foreign bodies contained within the plasma used in manufacturing their Factor VIII and Factor IX blood products;

h.   Failure to exercise reasonable care by complying with federal regulations then applicable to plasma collection and the manufacture of Factor VIII and Factor IX blood products;

i.   Failure to exercise reasonable care in disseminating information about their methods of manufacturing Factor VIII and Factor IX blood products and the risks that were created by said methods; and

j.   Failure to exercise reasonable care in recalling their Factor VIII and Factor IX blood products.

125.   Defendants knew, or should have known, that due to their failure to use reasonable care, Plaintiff and other people with hemophilia would use and did use Defendants' Factor VIII and/or Factor IX products to the detriment of their health, safety and well-being.

126.   As the direct, producing, proximate and legal result of the Defendants' negligence, Plaintiff has been injured and have incurred damages, including but not limited to permanent physical injuries to his person, medical and hospital expenses in the past, past disability, past loss of use of the body, and past physical and mental pain and suffering; and will incur in the future medical and hospital expenses, permanent disability, future loss of use of the body, future physical and mental pain and suffering, and loss of life and loss of the enjoyment of life.

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

127.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

128.    Defendants' conduct, as alleged above, was malicious, intentional and outrageous and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

**FOURTH CLAIM FOR RELIEF**

**NEGLIGENCE PER SE**

129.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further alleges as follows:

130.    Defendants violated applicable federal statutes and regulations relating to prescription drugs. Plaintiff is a person whom these statutes and regulations were meant to protect.

131.    Defendants' violation of these statutes or regulations constitutes negligence per se.

132.    Defendants' violation of these statutes or regulations was the direct, producing, proximate and legal cause of Plaintiff's injuries and damages. As the direct, producing and legal result of the Defendants' negligence, Plaintiff has been injured and has incurred damages, including but not limited to permanent physical injuries to his person, medical and hospital expenses in the past, past disability, past loss of use of the body, and past physical and mental pain and suffering; and will incur in the future medical and hospital expenses, permanent disability, fixture loss of use of the body, future physical and mental pain and suffering, and loss of life and loss of the enjoyment of life.

133.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

134.    Defendants' conduct, as alleged above, was malicious, intentional and outrageous and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

- 37 -

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

135.    For compensatory damages sustained by Plaintiff against all Defendants, jointly and severally, in an amount to be determined at trial;

136.    For punitive and exemplary damages according to proof against all Defendants;

137.    For an award of prejudgment interest, costs, disbursements and reasonable attorneys' fees;

138.    For injunctive relief in the form of an order requiring Defendants to preserve all relevant documents; and

139.    For such other and further relief as the Court deems equitable or appropriate under the circumstances.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

720327.1

FROM : PAPELARIA_PILARZINH.   rd.Nat.   PHONE NO. : 041 323539.                    JUL. 21 2007 03:41AM P2

Dated:  July 20, 2007

_____
Juliano Magnonn Bersani

Juliano Magnonn Bersani
Rua Thomaz Otto # 128
Pilarzinho, Curitiba
Brazil
CEP 82100520
Telephone: 41-9635-0692

Pro se Litigant

- 39 -

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

720327.1

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues stated.

Dated:  July 20, 2007

_____
Juliano Magnonn Bersani

Juliano Magnonn Bersani
Rua Thomaz Otto # 128
Pilarzinho, Curitiba
Brazil
CEP 82100520

Telephone: 41-9635-0692

Pro se Litigant

- 40 -