IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JULIANO MAGNUNN BERSANI, an individual, citizen of Brazil, | ) ) ) | |
| Plaintiff, | ) ) | CASE NO.: 1:07-cv-6268 |
| v. | ) ) ) | JUDGE JOHN F. GRADY |
| BAYER CORPORATION, an Indiana corporation, successor to CUTTER BIOLOGICAL, a California Corporation; BAXTER HEALTHCARE CORPORATION, a Delaware corporation, and its HYLAND DIVISION; ARMOUR PHARMACEUTICAL COMPANY, INC., a Delaware corporation; and ALPHA THERAPEUTIC CORPORATION, a California corporation, | ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**ANSWER, ADDITIONAL DEFENSES, AND JURY DEMAND OF DEFENDANT
AVENTIS INC.**

Now comes Aventis Inc. ("Aventis"), and for its answer to plaintiff's complaint states as follows:

This Answer is filed on behalf of Aventis only, and Aventis makes no response to the allegations of plaintiff's complaint which are not directed to Aventis. Aventis responds herein to the allegations directed to Aventis to the best of its ability, but notes that plaintiff's allegations relate to events that took place between 15 and 28 years ago, and documents related to those events are difficult to locate and may no longer exist, and individuals who may have knowledge of those events may be deceased or may no longer be employed by Aventis.

## I.    __INTRODUCTION__

1.    Defendants manufactured blood products known as "Factor VIII" and "Factor IX" for the treatment of hemophilia, and sold these products to people with hemophilia in Brazil and other foreign markets, despite knowledge that the products were manufactured from sick, high-risk donors known to be contaminated with the viruses that cause the Human Immunodeficiency Virus and Hepatitis C (now known as "HIV" or "HIV/AIDS" and "HCV" respectively). As discussed more fully in paragraphs 65 – 71, Defendants continued selling these products to people with hemophilia in Brazil and elsewhere even after the products ceased being sold in the United States due to the known risk of HIV/AIDS and HCV transmission. Defendants refused to recall old stocks of products they knew to be contaminated with HIV and HCV even after they had introduced a safer product.

__PARAGRAPH NO. 1 ANSWER:__    Aventis, the parent corporation of Armour, has never processed or sold coagulation factor concentrates and denies all allegations of paragraph 1 directed to Aventis.  Aventis lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 1 which are not directed to Aventis, and therefore denies them.

2.    Defendants manufactured HIV and HCV-contaminated blood factor products at plants in the United States using human plasma taken from thousands of paid American donors, including populations then known to be at high risk of carrying blood-borne diseases, such as urban homosexuals, prisoners, and intravenous drug users.  Defendants intentionally recruited urban homosexuals who had a history of viral hepatitis as plasma donors, despite regulations prohibiting the use of such donors and despite knowledge that the viruses that cause HIV/AIDS and HCV were  blood-borne diseases prevalent in such populations. Defendants continued using plasma taken from high-risk prison donors, even after promising the FDA that they would cease doing so.  Through their trade associations, Defendants actively conspired to conceal these practices and to substantially delay product recalls and implementation of safety measures.

__PARAGRAPH NO. 2 ANSWER:__    Aventis denies the allegations of paragraph 2 and further denies that it ever processed or sold factor concentrates.

3.    Defendants failed to fully and completely disclose the known risks of their products, including the risk of HIV/AIDS and HCV; failed to implement readily available screening tests that would have prevented HIV/AIDS and HCV by excluding contaminated plasma; failed to use available methods of treating plasma to kill viruses, including heat treatment and solvent detergent; and concealed and affirmatively misrepresented the extent of the health dangers of the diseases caused by the products.  For example, Defendant CUTTER BIOLOGICAL internally expressed a belief in the danger of HIV/AIDS transmission through

their untreated factor concentrate products, while publicly stating to foreign distributors and treaters that concerns over such infections were nothing more than unsubstantiated speculations. Defendants continued to ship untreated product to Brazil and other foreign markets even after introducing a safer product in the United States, in order to maintain their profit margin on existing contracts and sell off remaining stock no longer marketable domestically. Defendants also continued to sell old stocks of product that had not been treated with solvent detergent abroad, including stocks that Defendants knew or had reason to know were made from pooled blood contaminated with HCV, even after introducing a safer treated product with solvent detergent.

**PARAGRAPH NO. 3 ANSWER:**     Aventis denies the allegations of paragraph 3 and further

denies that it ever processed or sold factor concentrates.

4.     Defendants' efforts to maximize profits came at the expense of the health and lives of thousands of people with hemophilia in the foreign countries who were needlessly infected with HIV/AIDS and HCV, including JULIANO MAGNONN BERSANI.

**PARAGRAPH NO. 4 ANSWER:**     Aventis denies the allegations of paragraph 4 directed to

Aventis and further denies that it ever processed or sold factor concentrates.

## II.     JURISDICTION AND VENUE

5.     Plaintiff alleges an amount in controversy in excess of $75,000, exclusive of interest and costs.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and the Defendants.

**PARAGRAPH NO. 5 ANSWER:**     Aventis admits that plaintiff has alleged that the matter in

controversy exceeds the sum of $75,000, exclusive of interest and costs and that this Court has

jurisdiction.

6.     Plaintiff is informed and believes and upon such information and belief alleges that the unlawful, negligent and/or tortious activity alleged herein was carried out predominantly in the United States.  Defendants recruited high-risk paid donors in the United States with mixed plasma from such donors into the blood pool at their facilities in the United States. Defendants placed misleading labels on their products in the United States and made affirmative misrepresentations regarding their products' safety in the United States, which were relied upon by Plaintiff and his medical providers. Defendants' decisions to recruit paid donors from high-risk populations, to refrain from disclosing the known risks of their products, to forego implementing readily available procedures that would have prevented their products from transmitting HIV/AIDS and HCV, and to ship their products to Brazil and other foreign markets even after they could no longer be marketed domestically were all made in the United States.

Defendants' acts of conspiracy, including trade association meetings where they agreed to engage in wrongful conduct, also took place in the United States.

**PARAGRAPH NO. 6 ANSWER:**     Aventis denies the allegations of paragraph 6 and further

denies that it ever processed or sold factor concentrates.

7.     Plaintiff is informed and believes and upon such information and belief alleges that the vast majority of the evidence of the unlawful activity alleged herein is located in the United States. Documents showing Defendants' policies, practices, and decisions regarding recruitment of plasma donors, pooling of plasma at their facilities, labeling of their products, advertising and promotion of their products, disclosure or lack thereof of the risks posed by their products, implementation or lack thereof of procedures to prevent their products from transmitting HIV/AIDS and HCV, and shipment of their products to Brazil and other foreign markets are located almost exclusively in the United States. The vast majority of witnesses who will testify to these policies, practices, and decisions are also located in the United States, and would not be subject to subpoena in other countries. The expert witnesses likely to be presented by both Plaintiff and Defendants are also located in the United States.

**PARAGRAPH NO. 7 ANSWER:**     Aventis denies the allegations of paragraph 7 and further

denies that it ever processed or sold factor concentrates.

8.     Witnesses to the Plaintiff's damages, such as the Plaintiff's family members, are willing to travel to the United States to testify.

**PARAGRAPH NO. 8 ANSWER:**     Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 8, and therefore denies them.

9.     Because the vast majority of documentary and testimonial evidence is located in the United States, litigation in Plaintiff's home country would be costly and inefficient. In addition, Brazil is an inadequate alternative forum because of chronic and lengthy court delays and lack of subpoena power over physical evidence in the United States.

**PARAGRAPH NO. 9 ANSWER:**     Aventis denies that Brazil, which independently regulated

the sale of factor concentrates, is an inadequate alternative forum.  Aventis lacks knowledge or

information sufficient to form a belief as to the truth of the allegations regarding alleged costs,

inefficiencies, delays, and lack of subpoena power, and therefore denies said allegations.  With

respect to physical evidence in the United States, Aventis denies that such evidence would not be

available to plaintiffs.  Such evidence is already in the possession of plaintiff's counsel through

their participation in MDL 986, and procedures exist to seek discovery of evidence in the United

States for cases pending outside the United States.

10. Plaintiff is informed and believes upon such information and belief alleges that Defendants' unlawful activity was carried out, in significant part, in the Northern District of California. Defendant CUTTER BIOLOGICAL CORPORATION ("CUTTER"), the predecessor of Miles, Inc. and Defendant BAYER CORPORATION ("BAYER"), had its headquarters in Berkeley, California at all pertinent times. CUTTERS's Biological Management Committee met at its Berkeley headquarters, and it was at its Berkeley headquarters that the decisions were made to recruit high risk homosexual donors from cities in California, including San Francisco's drug-ridden Tenderloin neighborhood, and to ship blood products overseas. In addition, at all times pertinent, Defendant BAXTER CORPORATION, and/or its HYLAND DIVISION, had its main manufacturing plant in Glendale, California. HYLAND's President, Medical Director, and Head of Donor Recruitment all had their offices in the Glendale facility. Defendant BAXTER, and/or its HYLAND DIVISION, also recruited all their homosexual donors from California, particularly from San Francisco and Los Angeles. All Defendants obtained plasma from plasma collection centers located in San Francisco and Oakland.

**PARAGRAPH NO. 10 ANSWER:** Aventis denies the allegations of paragraph 10 directed to

Aventis and specifically denies that it ever processed or sold factor concentrates. Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 10 which are not directed to Aventis, and therefore denies them.

11. Plaintiff is informed and believes and upon such information and belief alleges that the evidence of Defendants' unlawful activity is located, in significant part, in the Northern District of California, where much of the unlawful activity was carried out. The majority of documentary evidence on liability is located in a facility in San Jose.

**PARAGRAPH NO. 11 ANSWER:** Aventis denies the allegations of paragraph 11 and

specifically denies that it ever processed or sold factor concentrates.

12. Plaintiff is informed and believes and on such information and belief alleges that the conduct by Defendants that is relevant to the subject matter of this action took place primarily in their respective headquarters locations, or in other facilities within the States of California and Illinois, giving these states significant contacts to the claims asserted by Plaintiff and creating state interests such that the choice of either or each of these states' laws to govern the adjudication of this action is neither arbitrary nor fundamentally unfair, and Plaintiff hereby consent thereto.

**PARAGRAPH NO. 12 ANSWER:** Aventis denies the allegations of paragraph 12 and

specifically denies that it ever processed or sold factor concentrates.

## III.    PARTIES

13.    Plaintiff JULIANO MAGNONN BERSANI, a resident of Curitiba, Brazil
who has hemophilia, was infected with HCV as a result of infusing Defendants' contaminated
factor concentrate and/or as a result of Defendants' conspiracy.  The Preliminary Patient Profile
Form (PPF) contains substantial additional information regarding Plaintiff's claim.

**PARAGRAPH NO. 13 ANSWER:** Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 13 concerning plaintiff's residency,

medical condition, or use of factor concentrate, and therefore denies them.  Aventis admits that

plaintiff has provided it with a Preliminary Patient Profile Form, but denies that the form

contains substantial information regarding plaintiff's claim.  Aventis specifically denies that it

ever processed or sold factor concentrates and denies the remaining allegations of paragraph 13.

14.    Plaintiff would not have chosen to be treated with Defendants' blood
products had he known of or been informed by Defendants of the true risks of using those
products or the nature of the sources of the products.

**PARAGRAPH NO. 14 ANSWER:** To the extent paragraph 14 is construed to state factual

allegations directed to Aventis, they are denied.  Aventis specifically denies that it ever

processed or sold factor concentrates.

15.    Defendant CUTTER, the predecessor of Miles, Inc., and Defendant
BAYER, was a California corporation headquartered in Berkeley, California at all pertinent times.
At all pertinent times CUTTER and its successors Miles, Inc. and BAYER regularly and
systematically engaged in the harvesting and collection of human plasma and the processing,
manufacturing, marketing, sale and distribution of  anti-hemophilic factor (hereinafter referred to
as "AHF") produced from such plasma, to which Plaintiff was exposed and which contributed
directly or indirectly to Plaintiff's infection with HCV.

**PARAGRAPH NO. 15 ANSWER:** Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 15, and therefore denies them.

16.     Defendant BAYER, formerly Miles, Inc., is and was an Indiana corporation, authorized to do business in all 50 states and the District of Columbia.  Miles, Inc. had its principal place of business operation in Elkhart, Indiana, while its successor BAYER has its principal place of business in Pennsylvania, with offices located at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.  At all pertinent times BAYER and its predecessors Miles, Inc., and CUTTER regularly and systematically engaged in the harvesting and collection of human plasma and the processing, manufacturing, marketing, sales and distribution of anti-hemophilic factor (hereinafter referred to as "AHF") produced from such plasma, to which Plaintiff was exposed and which contributed directly or indirectly to Plaintiff's infection with HCV.

**PARAGRAPH NO. 16 ANSWER:**  Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 16, and therefore denies them.

17.     Defendant BAXTER HEALTHCARE is a Delaware corporation, authorized to do business in all 50 states and the District of Columbia, with its principal place of business in Illinois, with offices located at One Baxter Parkway, Deerfield, Illinois 60015.  At all times pertinent, Defendant BAXTER, and/or its HYLAND DIVISION, had its main manufacturing plant in Glendale, California.  At all times pertinent, Defendant BAXTER, and/or its HYLAND DIVISION, and/or its wholly owned subsidiaries Travenol Laboratories and Fenwall Laboratories, regularly and systematically engaged in the harvesting and collection of human plasma and the processing, manufacturing, marketing, sale and distribution of AHF products produced from such plasma, to which Plaintiff was exposed and which contributed directly or indirectly to Plaintiff's infection with HCV.

**PARAGRAPH NO. 17 ANSWER:**  Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 17, and therefore denies them.

18.     Defendant BAXTER INTERNATIONAL, along with its principal subsidiary Defendant BAXTER WORLD TRADE, is a Delaware corporation and is owner and successor in interest to Immuno International A.G., and IMMUNO-US (described hereinafter collectively as, "IMMUNO"). BAXTER INTERNATIONAL and BAXTER WORLD TRADE have their principal place of business in Illinois, with offices located at One Baxter Parkway, Deerfield, Illinois 60015, and, on information and belief, are the parties liable for the injuries resulting from infusion with Immuno factor concentrates during the relevant period. In 1997, BAXTER INTERNATIONAL acquired all assets and liabilities of Immuno International A.G., an Austrian company that at all times pertinent sold AHF products to Brazil and other foreign markets that were produced from human plasma derived from paid donors in the United States. Immuno International A.G. operated in the United States at all times pertinent through its wholly owned American subsidiary IMMUNO-U.S., located in Rochester, Michigan. IMMUNO operated 15 processing centers in the United States in the 1980s, which collected plasma from high-risk donors for fractionation in plants located in Rochester, Michigan and Vienna, Austria. These products were then shipped all over the world, and contributed directly or indirectly to Plaintiff's infection with HCV. IMMUNO's product names, Bebulin, Feiba, and Prothromplex,

are listed as BAXTER INTERNATIONALS products in the 2003 Registry of Factor
Concentrates published by the World Federation for Hemophilia.

**PARAGRAPH NO. 18 ANSWER:** Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 18, and therefore denies them.

19.    IMMUNO-U.S. was a Michigan corporation and was at all pertinent times
a United States-based operating subsidiary of Immuno International A.G. The most recent
corporate filing for IMMUNO-U.S. is the 1998 certificate of merger filed by BAXTER, listing
the principal place of business for the surviving entity as One Baxter Parkway, Deerfield, IL,
60015, the same address for Defendants BAXTER INTERNATIONAL, BAXTER WORLD
TRADE, AND BAXTER HEALTHCARE.

**PARAGRAPH NO. 19 ANSWER:** Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 19, and therefore denies them.

20.    Defendant ARMOUR PHARMACEUTICAL COMPANY, INC., is a
Delaware corporation, authorized to do business in all 50 states and the District of Columbia,
with its principal place of business in Pennsylvania, with offices located at 500 Arcola Road,
P.O. Box 1200, Collegeville, Pennsylvania, 19426-0107. In 1996 Defendant ARMOUR merged
with Behringwerke A.G., a German company that at all times pertinent sold AHF products which
were produced from human plasma derived from paid donors in the United States, to form
Defendant AVENTIS BEHRING LLC, formerly Centeon Bio-Services, Inc., a Delaware
company with offices located at 1020 First Avenue, King of Prussia, Pennsylvania, 19406.
Defendant AVENTIS BEHRING LLC and its predecessors, Centeon Bio-Services, Inc. and
Armour Plasma Alliance, Inc., are wholly owned subsidiaries of Defendant AVENTIS INC.,
formerly Rhone-Poulenc Rorer International, Inc., formerly Rorer Group, Inc., a Pennsylvania
corporation authorized to do business in all 50 states and the District of Columbia, with offices
located at 300 Somerset Corporate Boulevard, Bridgewater, New Jersey, 088907. At all times
pertinent, Defendants ARMOUR PHARMACEUTICAL COMPANY, INC., AVENTIS
BEHRING LLC, and AVENTIS INC., (all of whom are described hereinafter collectively as
"ARMOUR") regularly and systematically engaged in the harvesting and collection of human
plasma and the processing, manufacturing, marketing, sales and distribution of AHF products
produced from such plasma, to which Plaintiff was exposed and which contributed directly or
indirectly to Plaintiff's infection with HCV.

**PARAGRAPH NO. 20 ANSWER:** Aventis admits that it was formerly known as Rhône-

Poulenc Rorer Inc., that Armour is a subsidiary of Aventis, that it is authorized to do business in

all 50 states, and that its principal place of business is located in Bridgewater, New Jersey.

Aventis denies that it ever processed or sold factor concentrates.  Aventis specifically denies that

it may properly be referred to as "Armour" and denies all remaining allegations of paragraph 20.

   21.  Defendant ALPHA THERAPEUTIC CORPORATION (hereinafter
"ALPHA") is a California corporation, authorized to do business in all 50 states and the District
of Columbia, with its principal place of business in California, with offices at 5555 Valley
Boulevard, Los Angeles, California 90032.  At all times pertinent, Defendant ALPHA has been
regularly and systematically engaged in the harvesting and collection of human plasma, and the
processing, manufacturing, marketing, sale and distribution of AHF products produced from
such plasma, to which Plaintiff was exposed and which contributed directly or indirectly to
Plaintiff's infection with HCV.

**PARAGRAPH NO. 21 ANSWER:**  Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 21, and therefore denies them.

   22.  Defendants CUTTER, ARMOUR, BAXTER HEALTHCARE, BAXTER
INTERNATIONAL, IMMUNO, (BAXTER HEALTHCARE, BAXTER INTERNATIONAL,
BAXTER WORLD TRADE AND IMMUNO shall hereinafter be collectively referred to as
"BAXTER") and ALPHA (herein collectively identified as "MANUFACTURERS" or
"DEFENDANTS") acting on behalf of themselves and/or their predecessor and/or successor
corporations, collected, harvested and/or processed human plasma and/or manufactured,
marketed, sold and distributed factor concentrate products to Brazil and other foreign markets
that were contaminated with HIV/AIDS and/or HCV.  In the alternative, one or more of said
Defendants participated in the collection, harvesting and/or processing of human plasma and/or
the manufacturing, marketing, distribution and sale of factor concentrate products to Brazil and
other foreign markets, or assumed, became or are responsible for the liabilities of the Defendants
and their predecessor or successor corporations who did participate in the collection, harvesting
and/or processing of human plasma and/or the manufacturing, marketing, distribution or sale of
factor concentrate products to Brazil and other foreign markets, without limitation thereto.

**PARAGRAPH NO. 22 ANSWER:**  Aventis specifically denies that it ever processed or sold

factor concentrates or collected plasma, and denies all remaining allegations of paragraph 22.

   23.  At all times herein mentioned, all Defendants and each of them, were fully
informed of the actions of their agents and employees, and thereafter no officer, director or
managing agent of Defendants repudiated those actions, which failure to repudiate constituted
adoption and approval of said actions, and all Defendants and each of them, thereby ratified
those actions.

**PARAGRAPH NO. 23 ANSWER:** Paragraph 23 is not a concise, direct averment of fact to

which Aventis can reasonably respond. To the extent paragraph 23 is construed to state factual

allegations directed to Aventis, they are denied.

## IV.    FACTUAL ALLEGATIONS

### A.    Hemophilia and Its Treatment

24.    Hemophilia is an inherited condition that causes uncontrolled
hemorrhaging or bleeding.  Hemophilia results from a deficiency of blood components essential
for coagulation.  The most common form of the disease is hemophilia A, characterized by a lack
of a blood protein known as Factor VIII, which affects approximately one in 10,000 males.
Factor VIII is commonly called "AHF," or anti-hemophilic factor.  Hemophilia B is
characterized by absence of another blood protein, known as Factor IX, affecting about one in
40,000 males.  Plaintiff JULIANO MAGNONN BERSANI has severe hemophilia A.

**PARAGRAPH NO. 24 ANSWER:** Aventis admits that hemophilia is a genetic bleeding

disorder characterized by a deficiency in one or more of the proteins needed for normal blood

clotting.  Aventis admits that hemophilia type A is characterized by a deficiency of the protein

Factor VIII, and that hemophilia type B is characterized by a deficiency of the protein Factor IX.

Aventis admits that AHF is a term of art which refers to Factor VIII concentrate.  Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

of paragraph 24, and therefore denies them.

25.    The treatment of hemophilia involves intravenous introduction, called
infusion, of the missing blood proteins required to stop bleeding.  The two most prevalent forms
of such treatment are cryoprecipitate and factor concentrates.  Factor concentrates are the
products made by Defendants in this action.  Cryoprecipitate is made by freezing plasma, the
fluid component of circulating blood in which various proteins, including Factor VIII and Factor
IX, are contained; thawing the frozen plasma; and isolating Factor VIII from the plasma through
centrifugal concentration.  Cryoprecipitate is an effective therapeutic agent for patients with
hemophilia A.  Hemophilia B has been effectively treated with the use of fresh frozen plasma
containing Factor IX.  Cryoprecipitate and fresh frozen plasma are made from small numbers of
donors, who are generally unpaid volunteers.

**PARAGRAPH NO. 25 ANSWER:** Aventis admits that the treatment of hemophilia involves

the infusion of missing blood proteins and that cryoprecipitate, made from frozen plasma,

contains Factor VIII and that fresh frozen plasma contains Factor IX.  Aventis further admits that

physicians may prescribe such treatments if indicated for their patients.  Aventis further admits

that individual units of cryoprecipitate or fresh frozen plasma may be from single donors, but

states that multiple units from multiple donors are generally required for treatment.  Aventis

specifically denies that it ever processed or sold factor concentrates, and denies all remaining or

inconsistent allegations of paragraph 25.

26.    By contrast, Defendants in the late 1960s to early 1970s began to market factor concentrates, or AHF, which contained Factor VIII and Factor IX in higher concentrations than had been available in either cryoprecipitate or fresh-frozen plasma.  To produce factor concentrates, Defendants mixed pools of plasma from five to twenty thousand donors at a time, a substantial percentage of which were paid donors.  These large pools were then subjected to processes to concentrate Factors VIII and IX.

**PARAGRAPH NO. 26 ANSWER:**  Aventis denies the allegations of paragraph 26 directed to

Aventis.  Aventis specifically denies that it ever processed or sold factor concentrates.  Aventis

lacks knowledge or information sufficient to form a belief as to the allegations of paragraph 26

relating to other defendants, and therefore denies them.

B.    **Even Before the Discovery of HIV and AIDS, Defendants Failed to Disclose or Warn of Serious Adverse Effects Associated with Factor Concentrates**

27.    Shortly after the initial commercial marketing of Factor VIII and IX concentrates in the late 1960s to early 1970s, a wide range of serious adverse effects were reported in association with these products.   Even before the dissemination of HIV, Defendants knew of serious diseases caused by unidentified agents transmissible by blood and Factor VIII and IX.  Defendants failed to warn Plaintiff or the medical community of these adverse effects, violating industry standards and federal regulations.

**PARAGRAPH NO. 27 ANSWER:**  Aventis denies the allegations of paragraph 27 directed to

Aventis.  Aventis specifically denies that it ever processed or sold factor concentrates.  Aventis

lacks knowledge or information sufficient to form a belief as to the remaining allegations of

paragraph 27, and therefore denies them.

28.    By 1976, only a few years after Defendants' factor concentrate products went on the market, the United States Food and Drug Administration ("FDA") Bureau of Biologics held a conference titled *Unsolved Therapeutic Problems in Hemophilia*. The research articles compiled from the conference discussed the high incidence of disorders in patients using Defendants' products, such as liver dysfunction, enlarged spleen, Hepatitis B, and Non-A, Non-B Hepatitis ("NANB Hepatitis," later renamed Hepatitis C). The articles concluded that these disorders were tied to the patients' use of factor concentrates, and emphasized the risks entailed in producing such concentrates using plasma from paid donors. As described below, however, Defendants not only refused to implement such a voluntary donor system, but instead recruited paid donors precisely because their hepatitis exposure resulted in plasma from which Defendants could make other commercially valuable products as well.

**PARAGRAPH NO. 28 ANSWER:** Aventis denies the allegations of paragraph 28 directed to

Aventis. Aventis specifically denies that it ever processed or sold factor concentrates. Aventis

lacks knowledge or information sufficient to form a belief as to the remaining allegations of

paragraph 28, and therefore denies them.

29.    Several of the articles from the 1976 conference also raised alarm over the unprecedented convergence of immune disorder in the hemophiliac community and called for close medical monitoring of the situation.

**PARAGRAPH NO. 29 ANSWER:** Aventis denies the allegations of paragraph 29 directed to

Aventis. Aventis specifically denies that it ever processed or sold factor concentrates. Aventis

lacks knowledge or information sufficient to form a belief as to the remaining allegations of

paragraph 29, and therefore denies them.

30.    At all times material to this Complaint, Defendants failed to adequately warn Plaintiff or his physicians of these serious adverse side effects. Several such adverse effects, including immunosuppression (suppression of the immune system), were not mentioned at all in the Defendants' package inserts, which were required to disclose adverse reactions pursuant to federal statutes and regulations and applicable standards of care. Although Defendants' package inserts mentioned a risk that plasma "may" contain the causative agent of viral hepatitis, this warning was seriously deficient in that: (a) Defendants failed to disclose that the risk of hepatitis was essentially a 100% guarantee due to their practices of using high-risk donors and specifically recruiting for donors who had previously been exposed to Hepatitis B; (b) while "hepatitis" simply means inflammation of the liver, and may be a relatively benign, temporary condition, Defendants failed to warn that some forms of hepatitis transmitted by their products were believed to present a considerable risk of severe liver damage, cirrhosis, and significantly elevated risk of cancer; (c) Defendants misleadingly stated that the source plasma used in preparation of the product had been found to be non-reactive for Hepatitis B surface

antigen (HBsAg)—implying that no viral hepatitis was present in the plasma—and falsely stated that available methods were not sensitive enough to detect all units of potentially infectious plasma, while failing to disclose that Defendants had refused to implement the more sophisticated Hepatitis B Core antibody (HBc) test which would have excluded essentially all plasma contaminated by Hepatitis B; and (d) Defendants' labeling disclosed that the product was made from large pools of fresh human plasma, but failed to disclose that paid donors increased the risk of disease, and that the particular groups of paid donors targeted by Defendants were known to be the highest risk groups.

**PARAGRAPH NO. 30 ANSWER:** Aventis denies the allegations of paragraph 30 directed to

Aventis. Aventis specifically denies that it ever processed or sold factor concentrates. Aventis

lacks knowledge or information sufficient to form a belief as to the remaining allegations of

paragraph 30, and therefore denies them.

### C.    Defendants Recruited Plasma Donors from High-Risk Populations to Manufacture Factor VIII and IX.

31.    The demand for and supply of anti-hemophilia factor rapidly increased during the 1970's with commercially-manufactured concentrate accounting for a large proportion of the increase in supply. In 1977, a federal report projected that the volume of AHF manufactured would increase substantially by 1980. Division of Blood Diseases and Resources, National Heart, Lung and Blood Institute, *Study to Evaluate the Supply-Demand Relationships for AHF and PTC Through 1980*, at page 8; hereinafter "NHLBI Report."

**PARAGRAPH NO. 31 ANSWER:** Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 31, and therefore denies same.

32.    In order to sell more AHF to this growing market, Defendants turned to the fastest and cheapest way of obtaining sufficient plasma, paid donors. Defendants recruited paid donors from those populations most likely to respond to the financial incentive to donate: poor inner city residents, drug abusers, prisoners, and residents of impoverished developing countries such as Haiti and Nicaragua.

**PARAGRAPH NO. 32 ANSWER:** Aventis denies the allegations of paragraph 32, and

specifically denies that it ever processed or sold factor concentrates.

33.    Defendants purposefully sought out paid donors despite knowing that the risk of diseases transmissible by blood was far greater among paid donors than among volunteers. Because no test was available yet for the NANB Hepatitis virus identified in the early 1970s, an essential means to prevent the virus from contaminating the plasma supply was to exclude donors with behaviors that were inconsistent with good health—precisely those

populations from which Defendants were recruiting paid donors. Some studies indicated that paid donors were up to ten times more infectious than volunteer donors. For this reason, the National Blood Policy, adopted by the federal government in July 1973, advocated conversion to an all-volunteer blood supply. Defendants, however, not only continued to use paid donors, but also focused their recruiting efforts on the highest risk populations.

**PARAGRAPH NO. 33 ANSWER:** Aventis denies the allegations of paragraph 33, and

specifically denies that it ever processed or sold factor concentrates.

34.    Defendants had an additional financial incentive for recruiting paid donors. Factor VIII and Factor IX are only two of many products that can be made for commercial sale from human plasma. According to the NHLBI Report, by the late 1970s at least 17 different therapeutic components of blood were manufactured by the process of "fractionating" plasma into its various elements. The NHLBI Report noted that, "as the costs of fractionation have increased, fractionators have produced as many products as possible from a liter of plasma." *Id.* at 65.

**PARAGRAPH NO. 34 ANSWER:** Aventis admits that plaintiff has accurately quoted the

NHLBI Report, but denies that plaintiff has accurately characterized the report. To the extent

that paragraph 34 is construed to make factual allegations directed to Aventis, they are denied.

Aventis specifically denies that it ever processed or sold factor concentrates.

35.    Blood derivatives used as vaccines or therapeutics had particularly high economic value for Defendants. The NHLBI Report noted that plasma with a very high titer, or antibody level, for a corresponding antigen is "very expensive." *Id.* at 41. Such products are manufactured from source plasma drawn from donors who have been sensitized to a particular antigen. *Id.* The NHLBI Report specifically stated, however, that "plasma collected for high antibody titer cannot be used for fractionation into therapeutic products," such as Defendants' factor concentrate. *Id.* (emphasis added) [*sic*].

**PARAGRAPH NO. 35 ANSWER:** Aventis admits that plaintiff has accurately quoted the

NHLBI Report, but denies that plaintiff has accurately characterized the report. To the extent

that paragraph 35 is construed to make factual allegations directed to Aventis, they are denied.

Aventis specifically denies that it ever processed or sold factor concentrates.

36.    Defendants targeted donors with high titers to Hepatitis B antigens in order to manufacture and sell Hepatitis B immunoglobulin (HBIG), a product that confers temporary immunity to the Hepatitis B virus. Despite the warning in the NHLBI report, Defendants used the same high-titer plasma they obtained for making HBIG to manufacture the Factor VIII and IX products used by people with hemophilia. Defendants thus sought to

maximize profits by producing "as many products as possible from a liter of plasma," while ignoring industry standards that precluded the use of high-titer plasma for other therapeutic products.

**PARAGRAPH NO. 36 ANSWER:**  Aventis denies the allegations of paragraph 36, and

specifically denies that it ever processed or sold factor concentrates.

37.    Beginning in about 1978, Defendants BAXTER, CUTTER and ALPHA began targeting homosexual donors in known urban gay communities.  Because urban homosexuals had been reported in the 1970s to have exceptionally high prevalence of Hepatitis B infection, Defendants knew that such donors would provide a reliable source of plasma for the manufacture of commercially valuable HBIG.

**PARAGRAPH NO. 37 ANSWER:**  Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 37, and therefore denies them.

38.    It was also well-known in the public health community by the 1970s that urban homosexuals engaged in promiscuous sexual practices that rapidly transmitted other diseases, including NANB Hepatitis, which were transmitted by blood and were believed to have serious adverse consequences.  Despite this knowledge, Defendants used the same plasma pool from urban homosexuals to manufacture both HBIG and Factor VIII and IX.

**PARAGRAPH NO. 38 ANSWER:**  To the extent that paragraph 38 is construed to state

allegations directed to Aventis, they are denied.  Aventis further denies that it ever processed or

sold factor concentrates.

39.    Defendants continued this dual use of high-risk plasma even after federal reports warned of the rapid spread of fatal immunosuppressive disease among the same homosexual population from which Defendants heavily recruited. Defendants knew or should have known by no later than the summer of 1981 that urban homosexual males were not "suitable donors" within the meaning of federal regulations and/or other applicable standards of care.

**PARAGRAPH NO. 39 ANSWER:**  Aventis denies the allegations of paragraph 39.  Aventis

further denies that it ever processed or sold factor concentrates.

40.    By the 1970s, it was also well-established that plasma from prison populations carried a high risk of hepatitis and other blood-borne diseases, primarily because of the concentration of intravenous (IV) drug users in prisons.  Despite knowledge of this risk, Defendants actively recruited prisoners for plasma used to manufacture Factor VIII and IX, while concealing or failing to disclose the risk to Plaintiff, his physicians, or the FDA.

**PARAGRAPH NO. 40 ANSWER:** Aventis denies the allegations of paragraph 40 directed to

Aventis and specifically denies that it ever processed or sold factor concentrates.  Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 40 which are not directed to Aventis, and therefore denies them.

      41.     In light of Defendants' special knowledge of the disease patterns among
urban homosexuals and prisoners, and their recruitment of such donors for Factor VIII and IX
manufacture, Defendants had duties to: (a) promptly investigate the first reports of opportunistic
infections among urban homosexuals in 1981; (b) discontinue the practice of using such high risk
donors; (c) disclose the risk to Plaintiff, his physicians, and the FDA, including the ongoing risk
of continuing to use Factor VIII and IX previously manufactured with high risk plasma and still
marketed to patients; (d) implement procedures to kill blood-borne diseases in the products; and
(e) recall existing products from distribution or further use.  Instead, Defendants continued to
conceal their recruitment of high-risk donors and to resist warnings and recalls, and failed to
implement procedures to make their products safe.

**PARAGRAPH NO. 41 ANSWER:** Aventis denies the allegations of paragraph 41 and

specifically denies that it ever processed or sold factor concentrates.

    **D.**    **Defendants Failed to Use the Available Hepatitis B Core (HBc) Test to
Exclude Plasma from High Risk Donors**

      42.     By no later than 1978, Defendants knew of the availability of a new test to
determine whether an individual had a history of viral hepatitis, which would have disqualified
the donor from providing plasma for the manufacture of Factor VIII or IX.  By testing a person's
serum for the presence of the core to the Hepatitis B antibody, a history of viral hepatitis could
be verified.  This was known as the "HBc test."  Published, peer-reviewed literature shows that
the HBc test was in use by researchers to determine that homosexual AIDS victims had a history
of viral hepatitis by no later than December 1981.  Gottlieb, et al., *Pneumocystis Carinii
Pneumonia and Mucosal Candidiasis in Previously Healthy Homosexual Men*, 305 New Eng. J.
Med. 1425-1431 (1981).

**PARAGRAPH NO. 42 ANSWER:** Aventis denies the allegations of paragraph 42 and

specifically denies that it ever processed or sold factor concentrates.

      43.     Use of the HBc test would have eliminated approximately 75% of
homosexual plasma donors and over 90% of promiscuous urban homosexuals.  It would have
eliminated almost 100% of intravenous drug users.

**PARAGRAPH NO. 43 ANSWER:**  Aventis denies the allegations of paragraph 43 and

specifically denies that it ever processed or sold factor concentrates.

44.     Use of the HBc and ALT tests by Defendants by 1981 would thus have eliminated the vast majority of the transmitters of HIV and HCV from the blood and plasma pools of the nation, before the height of the AIDS and Hepatitis C epidemics.  If Defendants had implemented this test in a timely manner, Plaintiff would never have been infected with HCV as a result of factor concentrate use.

**PARAGRAPH NO. 44 ANSWER:**  Aventis denies the allegations of paragraph 44 and

specifically denies that it ever processed or sold factor concentrates.

45.     Plaintiff and thousands of other people with hemophilia in Brazil and other countries became infected by the AIDS and Hepatitis C viruses through repeated exposures to blood products manufactured from large pools of plasma donors (5,000 to 40,000). If Defendants had used the HBc and ALT tests to decrease by 70% to 90% the number of HIV and HCV positive donors who went into the pool, the infectivity of the product would have decreased substantially. Consequently, the rate of infection of people with hemophilia would have slowed down enormously, and the medical and scientific community would have been given more time to react appropriately to the HIV and Hepatitis C epidemics.

**PARAGRAPH NO. 45 ANSWER:**  Aventis denies the allegations of paragraph 45 and

specifically denies that it ever processed or sold factor concentrates.

46.     As noted below, federal regulations required plasma donors to be in good health, and donors with a "history of viral hepatitis" were by definition unacceptable as blood or blood plasma donors.  Persons with a history of viral hepatitis were excluded not only because of the risk of transmitting Hepatitis B, but because such a history indicated a lifestyle or previous behavior of the prospective donor that carried the risk of transmitting other viruses in addition to hepatitis.  A reasonable and prudent plasma fractionator would not accept a HBc positive donor and expect to be in compliance with federal regulations as of 1978.

**PARAGRAPH NO. 46 ANSWER:**  Aventis denies the allegations of paragraph 46 and

specifically denies that it ever processed or sold factor concentrates.   Aventis lacks knowledge

or information sufficient to form a belief as to the truth of the allegations of paragraph 46 which

are not directed to Aventis, and therefore denies them.

47.     After public reports of the first hemophilia AIDS cases in July 1982, government officials urged Defendants to implement the HBc test as a "surrogate" or "marker" to eliminate plasma contaminated by the transmitter of AIDS and Hepatitis C.  HBc testing was

also strongly suggested to Defendants by the CDC at a meeting of the United States Public Health Service ("PHS") on January 4, 1983. Despite this urging, Defendants continued to use contaminated plasma donations that would have been excluded by the HBc test and continued to conceal from Plaintiff, his physicians, and the FDA the dangerous practice of targeting donors at highest risk. At a January 6, 1983 meeting of Defendants' trade association, the Pharmaceutical Manufacturer's Association, Defendants agreed <u>not</u> to implement the highly effective HBc donor screening, and instead opted to use ineffective donor questionnaires that did little to screen out donors at high-risk for AIDS and Hepatitis C transmission.

**PARAGRAPH NO. 47 ANSWER:** Aventis denies the allegations of paragraph 47 directed to

Aventis, and specifically denies that it ever processed or sold factor concentrates. Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 47 which are not directed to Aventis, and therefore denies them.

48.    As late as December 13, 1983, years after the HBc test was available, a memorandum from CUTTER's responsible head Stephen Ojala to various CUTTER executives, reporting back on a meeting held by Defendants, shows that all Defendants conspired to propose a "task force" to further study the use of HBc as an intentional, bad faith "delaying tactic for the implementation" of the test.

**PARAGRAPH NO. 48 ANSWER:** Aventis denies the allegations of paragraph 48 directed to

Aventis, and specifically denies that it ever processed or sold factor concentrates. Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 48 which are not directed to Aventis, and therefore denies them.

### E.    Defendants Also Failed to Implement Available Heat Treatment and Solvent Detergent Treatment to Kill Blood-Borne Diseases

49.    In the late 1970s and early 1980s, it was recognized that viruses were in all AHF products, including Factor VIII and IX. Heat Treatment and Treatment with solvents and/or detergents was available at that time to eliminate many of these viruses, including HIV and HCV. Defendants were required to take reasonable steps to eliminate contamination, but Defendants failed to utilize these available technologies to eliminate the viruses in a timely manner.

**PARAGRAPH NO. 49 ANSWER:** Aventis denies the allegations of paragraph 49 directed to

Aventis, and specifically denies that it ever processed or sold factor concentrates. Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 49 which are not directed to Aventis, and therefore denies them.

50.    The 1977 NHLBI Report noted that albumin, another plasma product, was "heat-treated to remove almost all danger of hepatitis." *Id.*, at p. 49. Defendant ARMOUR'S memorandum of June 1983 acknowledged that no cases of AIDS had been reported in heat-treated albumin users, but misleadingly stated that heat treatment of Factor VIII and IX was not yet feasible. It was clearly known by no later than 1977 that heat treatment was an effective way to make blood products safer, but Defendants wrongfully refused to implement such procedures for Factor VIII and IX. In 1995, the National Institutes of Health Institute of Medicine ("IOM") issued a report on the hemophilia AIDS epidemic which concluded that Defendants "did not seriously consider alternative inactivation processes," including heat treatment, and that "heat treatment processes to prevent the transmission of hepatitis could have been developed before 1980." Heat-treated, HIV-safe factor concentrates were not introduced by any defendant until 1983, and were not universally in use until 1985.

**PARAGRAPH NO. 50 ANSWER:** Aventis denies the allegations of paragraph 50 directed to

Aventis, and specifically denies that it ever processed or sold factor concentrates.   Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 50 which are not directed to Aventis, and therefore denies them.

51.    In addition to heat treatment, solvent and/or detergent treatment was available to Defendants by the late 1970s as a simple and effective method of eliminating viruses in factor concentrate products. Solvent detergent effectively kills viruses such as HIV and HCV by destroying the viruses' lipid envelope. It is simpler than heat treatment, and unlike heat treatment, does not interfere with the Factor VIII and IX proteins needed for blood clotting.

**PARAGRAPH NO. 51 ANSWER:** Aventis denies the allegations of paragraph 51 directed to

Aventis, and specifically denies that it ever processed or sold factor concentrates.   Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 51 which are not directed to Aventis, and therefore denies them.

52.    Solvents and/or detergents were well-known, commercially available products as of the 1970s, and studies in which solvent and/or detergent treatment was used to disrupt viruses were published in the 1970s in peer-reviewed journals.  In 1980, Dr. Edward Shanbrom, a former BAXTER scientist, received a patent for a detergent treatment process for viral inactivation of factor concentrate.  Dr. Shanbrom describes the implementation of this process as "as easy as washing your hands."

**PARAGRAPH NO. 52 ANSWER:**  The allegations of paragraph 52 are not directed to Aventis and therefore require no response on behalf of Aventis.  To the extent that paragraph 52 is construed to state factual allegations directed to Aventis, they are denied.  Aventis specifically denies that it ever processed or sold factor concentrates.

53.     After receiving the patent, Dr. Shanbrom approached Defendants about implementing his method, but Defendants refused to heed Dr. Shanbrom's advice.  Defendants refused to even commit any resources to investigate the solvent and/or detergent method.

**PARAGRAPH NO. 53 ANSWER:**  Aventis denies the allegations of paragraph 53 directed to Aventis, and specifically denies that it ever processed or sold factor concentrates.  Aventis lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 53 which are not directed to Aventis, and therefore denies them.

54.     Defendants were notified of the successful use of organic solvents to destroy lipid viruses, including NANB, in factor concentrates by the New York Blood Center ("NYBC") at the National Hemophilia Federation's meeting on October 27, 1983.

**PARAGRAPH NO. 54 ANSWER:**  Aventis denies the allegations of paragraph 54, and further denies that it ever processed or sold factor concentrates.

55.     In 1984, Dr. Prince and Dr. Horowitz of the NYBC published the results of their successful use of the solvent detergent process in well-known medical journals.  They offered to license the process to Defendants for a reasonable fee.  In 1985, the NYBC obtained a license from the FDA to market a solvent detergent inactivated factor concentrate.

**PARAGRAPH NO. 55 ANSWER:**  Aventis admits that in 1984 Dr. Prince and Dr. Horowitz published an article in *Vox Sang* titled "Inactivation of Hepatitis B and Hutchinson Strain Non-A, Non-B Hepatitis Viruses by Exposure to Tween 80 and Ether."  Aventis denies that the article reported "successful use of the solvent detergent process."  Aventis specifically denies that it ever processed or sold factor concentrates and denies all remaining or inconsistent allegations of paragraph 55.

56.     By March, 1984, Defendants obtained licenses to sell Factor VIII treated with dry heat to inactivate viruses, and Defendants had obtained such licenses for Factor IX by October, 1984.  The FDA did not allow them to label these products as hepatitis safe.  By fall of 1984, Defendants were notified by treaters that previously-untreated patients in their clinical trials using its dry heated product developed elevated ALT enzymes, indicative of NANB infections.

**PARAGRAPH NO. 56 ANSWER:**  Aventis denies the allegations of paragraph 56 directed to

Aventis, and specifically denies that it ever processed or sold factor concentrates.  Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 56 which are not directed to Aventis, and therefore denies them.

57.     Defendants were therefore aware in 1984 that dry heat did not effectively inactivate the virus that causes HCV, and that solvent detergent treatment methods did eliminate the risk of HCV infection, but chose not to employ the effective and efficient solvent detergent technology.  Instead, Defendants continued to sell their contaminated dry heat product for at least four more years.

**PARAGRAPH NO. 57 ANSWER:**  Aventis denies the allegations of paragraph 57, and further

denies that it ever processed or sold factor concentrates.

58.     A recent CDC study documented the comparative effectiveness of the dry heat and solvent detergent inactivation methods.  The study reported that "84% of previously untreated patients infused with dry-heated Factor VIII products developed non-A, non B hepatitis... ."  Soucie, Richardson, Evatt et al., *Risk Factor for Infection with HBV and HCV in a Large Cohort of Hemophiliac Males,* 41 Transfusion 338-343 (2001).

**PARAGRAPH NO. 58 ANSWER:**  Aventis admits that paragraph 58 contains a partial quote of

a Transfusion article, but denies that plaintiff has accurately characterized the article.  To the

extent that paragraph 58 is construed to state factual allegations directed to Aventis, Aventis

denies them, and specifically denies that it ever processed or sold factor concentrates.

59.     The same CDC study reported that "solvent detergent treatment of blood components [was] found to be more effective against enveloped viruses than heat treatment... No cases of HBV, HCV, or HIV transmission through solvent detergent virus inactivated products have been found in prospective studies of previously untreated patients..."

**PARAGRAPH NO. 59 ANSWER:**  Aventis denies that plaintiff has accurately quoted or

characterized the article referenced in paragraph 59.  To the extent that paragraph 59 is construed

to state factual allegations directed to Aventis, Aventis denies them, and specifically denies that

it ever processed or sold factor concentrates.

60.     The study further reported "in our data, the first dramatic decline in HCV
prevalence appears in the 1987 birth cohort.  The drop in HCV transmission correlates with the
licensing of solvent detergent treatment of Factor IX products in 1987.  In addition, this cohort
would have been the first to benefit from the screening of blood donors using the surrogate
markers ALT (begun in late 1986) and anti-HBc (begun in 1987), testing that was associated
with a markedly decreased risk of HCV infection from blood transfusions."

**PARAGRAPH NO. 60 ANSWER:**  Aventis denies that plaintiff has accurately quoted the

article referenced in paragraph 60.  To the extent paragraph 60 is construed to state factual

allegations directed to Aventis, Aventis denies them, and specifically denies that it ever

processed or sold factor concentrates.

61.     The study states further that "the residual transmissions after 1987
possibly represent the use of product already manufactured or product manufactured during the
interval required to implement the new technology.  The 18-month shelf life of factor
concentrates placed those people with hemophilia born as late as 1989 at risk of infection." The
study goes on to recommend testing for all people with hemophilia who received infusions of
Defendants' blood products prior to 1992.

**PARAGRAPH NO. 61 ANSWER:**  Aventis denies that plaintiff has accurately quoted or

characterized the article referenced in paragraph 61.  To the extent paragraph 61 is construed to

state factual allegations directed to Aventis, Aventis denies them, and specifically denies that it

ever processed or sold factor concentrates.

62.     By 1988, it was clear to the medical and scientific community what
Defendants had long known: dry-heated factor concentrates were transmitting the potentially
deadly NANB virus, and safer products were available.  This knowledge prompted the CDC to
publish recommendations that dry-heated products no longer be used by hemophiliacs.
Defendants continued sales of their dry-heated products after these warnings, however, and never
undertook a large-scale recall of dry-heated product.  Defendants finally introduced solvent
detergent-treated products to the market in 1988 and 1989, but continued to sell their NANB-
contaminated dry-heated factor concentrates after this date.

**PARAGRAPH NO. 62 ANSWER:** Aventis denies the allegations of paragraph 62 directed to

Aventis, and specifically denies that it ever processed or sold factor concentrates.  Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 62 which are not directed to Aventis, and therefore denies them.

       63.     The failure of Defendants to implement solvent and/or detergent viral
inactivation techniques in a timely manner, to warn of the risk that dry heat treated Factor VIII
and IX blood products could transmit HCV, and to recall dry heat-treated products that posed
this risk caused the needless infection of thousands of people with hemophilia with HCV,
including Plaintiff.  Even after Defendants knew or should have known that solvent and/or
detergents effectively destroyed HCV, they continued to sell dry heat-treated Factor VIII and IX,
and refused to recall these dangerous products from the market.

**PARAGRAPH NO. 63 ANSWER:** Aventis denies the allegations of paragraph 63, and

specifically denies that it ever processed or sold factor concentrates.

      **F.**    **Defendants Continued to Allow the Sale of Non-Heat Treated Factor
Concentrate Products Abroad Even After They Stopped Selling Non-Heat
Treated Product in the United States.**

      64.     Between 1983 and 1985, Defendants stopped selling non-heat treated
factor concentrate in the United States and introduced a vastly safer heat-treated version.
However, one or more Defendants, including BAXTER/IMMUNO continued to ship their
remaining stocks of non-heat treated product abroad to Brazil and other countries after ceasing
sales of such product in the United States, despite knowledge that the non-heat treated product
was contaminated with HIV and/or HCV.

**PARAGRAPH NO. 64 ANSWER:** Aventis denies the allegations of paragraph 64 directed to

Aventis, and specifically denies that it ever processed or sold factor concentrates.  Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 64 which are not directed to Aventis, and therefore denies them.

      65.     As detailed herein, by the end of 1982 Defendants' internal
communications in the United States revealed their awareness of the AIDS risk posed by their
products, but they continued to disavow the connection between AIDS and factor concentrates in
their communications to foreign doctors and persons with hemophilia. In mid-1983, for example,
months after CUTTER executives authored internal memos expressing their belief that factor
concentrates transmitted AIDS, the company wrote a letter to its foreign distributors in which it
characterized the concern over AIDS as an "irrational response," and dismissed the notion that

AIDS could be transmitted by factor concentrates as "unsubstantiated speculation." Internal CUTTER document. CUTTER told the distributors that "[w]hat little evidence exists…tends to suggest that AHF concentrates have no direct role in [the AIDS] syndrome." Similarly, CUTTER told foreign hemophilia treaters in late 1983 that transmission of AIDS through factor concentrates "has not been medically linked." Internal CUTTER document.

**PARAGRAPH NO. 65 ANSWER:**  Aventis denies the allegations of paragraph 65 directed to

Aventis.  Aventis specifically denies that it ever processed or sold concentrates.  Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 65 which are not directed to Aventis, and therefore denies them.

66.     CUTTER also disputed the safety of heat-treated products in its representations to the foreign hemophilia community, at the same time that it worked furiously to introduce its own heat-treated product. In its letter to foreign distributors, CUTTER stated that "it would be of questionable value for hemophilia patients to be persuaded to change to" heat-treated products because there is "no guarantee of increased protection…. [I]t is more desirable to prevent the introduction of a possible AIDS agent in the starting material than to attempt to eliminate it with unproven procedures at a later stage in the process. Internal CUTTER document.

**PARAGRAPH NO. 66 ANSWER:**  Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 66, and therefore denies them.

67.     Once CUTTER had introduced its own heat-treated Factor VIII in early 1984, however, it did not hesitate to tout heat treatment as a safer alternative, circulating data showing its effectiveness in killing model viruses to its customers. Defendants' shipping records, however, indicate that they did not cease sales of their contaminated non-heat treated ("non-HT") product in other countries after introducing this safer alternative. In fact, Defendants sought to undermine attempts by foreign governments to ban their non-HT products.

**PARAGRAPH NO. 67 ANSWER:**  Aventis denies the allegations of paragraph 67 directed to

Aventis, and specifically denies that it ever processed or sold factor concentrates.  Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 67 which are not directed to Aventis, and therefore denies them.

68.     In October of 1984, the CDC issued a report announcing that 74% of recipients of Factor VIII concentrates made from plasma derived from American donors were HIV positive. The CDC report also publicized studies showing that CUTTER's heat treatment process effectively killed the virus.

**PARAGRAPH NO. 68 ANSWER:**  Inasmuch as it fails to identify the study to which it refers,

paragraph 68 is not a concise averment of fact to which Aventis can reasonably respond.

Aventis denies that the CDC issued any report referencing HIV in 1984 because the term "HIV"

was not used until 1986.  Aventis admits that heat treatment was effective in destroying HIV.

Aventis denies the remaining allegations of paragraph 68 directed to Aventis, and specifically

denies that it ever processed or sold factor concentrates.  Aventis lacks knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph 68 which are not directed

to Aventis, and therefore denies them.

69.     Even after this report, however, Defendants failed to withdraw their non-
HT factor from Brazil and other foreign countries in favor of heat treated product. The CDC
report also publicized studies showing that heat treatment effectively killed the HIV virus. Upon
information and belief, Defendants did not upon receiving this news recall or withdraw their
unheated products from Brazil. Such products therefore remained on the shelves and continued
infecting Brazilian hemophiliacs until their expiration dates. Upon information and belief,
IMMUNO dumped unheated factor concentrates to Brazil until at least mid-1985, and these
products caused HIV infection in Brazilian hemophiliacs into 1987, three years after IMMUNO
had introduced a heat-treated, HIV safe product.

**PARAGRAPH NO. 69 ANSWER:**  Aventis denies the allegations of paragraph 69 directed to

Aventis and specifically denies that it ever processed or sold concentrates.  Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 69 not directed to Aventis, and therefore denies them.

70.     Defendants finally withdrew non-HT factor from the United States in mid-
1985 as a result of pressure from the FDA, but failed to do the same in Brazil and elsewhere. As
a result, persons with hemophilia in Brazil continued to use non-HT factor long after Defendants
first made heat-treated factor available to American persons with hemophilia, causing numerous
needless infections and deaths.

**PARAGRAPH NO. 70 ANSWER:**  Aventis denies the allegations of paragraph 70 directed to

Aventis and specifically denies that it ever processed or sold concentrates.  Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 70 not directed to Aventis, and therefore denies them.

### G.    Defendants Fraudulently Misrepresented the Safety, and Concealed the Dangers, of Their Factor VIII and IX Products

71.    Defendants engaged in a pattern and practice of fraudulent concealment of their dangerous practices, fraudulent misrepresentations of the extent of their efforts to assure safety, and fraudulent misrepresentations that understated the risk of AIDS and Hepatitis C, in order to maintain profits from both factor concentrates and HBIG.  A summary of Defendants' fraudulent misrepresentations and concealment is set forth below.

**PARAGRAPH NO. 71 ANSWER:**  Aventis denies the allegations of paragraph 71, and

specifically denies that it ever processed or sold factor concentrates.

72.    On July 27, 1982, a meeting of the Public Health Service was held as the result of the CDC's report that three people with hemophilia had contracted AIDS.  The responsible heads of ARMOUR, ALPHA, CUTTER, AND BAXTER were in attendance, along with officials from the National Hemophilia Foundation, CDC and FDA.  At least three of the Defendants were aware that they had used plasma from known, targeted homosexuals in the manufacture of Factor VIII and IX blood products.  These products had a shelf life of two and three years, respectively, and were either in production or already on the shelves in pharmacies waiting to be infused by people with hemophilia who purchased them.  The Defendants involved, CUTTER, BAXTER and ALPHA, failed to disclose these facts at the meeting, despite knowledge that the CDC's primary concern at the meeting was the contamination of Factor VIII and IX by the transmitter of AIDS, which was already well-known to be epidemic in the targeted homosexual population.  CUTTER memorandum dated August 3, 1982.

**PARAGRAPH NO. 72 ANSWER:**  Aventis denies the allegations of paragraph 72 and

specifically denies that it ever processed or sold concentrates.

73.    In or about December, 1982, Michael Rodell, the responsible head for BAXTER, entered into an agreement with officials of the FDA to the effect that BAXTER would no longer use prison plasma in the production of factor concentrates.  In fact, BAXTER, unbeknownst to the FDA, continued to use prison plasma in factor concentrate production through October 1983.  BAXTER memorandum dated October 20, 1983.

**PARAGRAPH NO. 73 ANSWER:**  Aventis lacks knowledge or information sufficient to form

a belief as to the allegations of paragraph 73, and therefore denies them.

74.    On January 5, 1983, an AIDS meeting was held at Children's Orthopedic Hospital in Los Angeles, California, the largest hemophilia treatment center in the United States.

Representatives of four Defendants were present at the meeting with treaters and patients.  The purpose of the meeting was to have Defendants' representatives answer patients' questions about AIDS transmission through factor concentrates. A patient asked representatives from CUTTER, ALPHA, ARMOUR, and BAXTER the following question: "Is the plasma from homosexuals, prisoners, Haitians or other high risk persons being used in the manufacture of concentrates?" No Defendants admitted targeting or using plasma from homosexuals, prisoners or inner city IV drug abusers.  Dr. Goodman from BAXTER answered regarding BAXTER'S use of known homosexuals as follows: We are changing the nature of questions to homosexuals to the best of our ability." CUTTER'S responsible head, Stephen Ojala, an ALPHA representative, and ARMOUR'S Karl Hansen made no response to the question. This partial and misleading response amounted to concealment of the true risk created by the use of plasma from known homosexuals, IV drug abusers and prisoners in the manufacture of factor concentrates.

**PARAGRAPH NO. 74 ANSWER:**  Aventis denies the allegations of paragraph 74, and

specifically denies that it ever processed or sold factor concentrates.

75.     At the January 5, 1983 meeting, and in the presence of the patients, one of the treating physicians, Dr. Kasper, asked CUTTER's Stephen Ojala:  "These [plasma] centers seem to be in rundown centers of town.  Is there a move to move them to rural towns?" Ojala answered: "Many of the centers are in smaller communities and in towns such as Ypsilanti, Seattle, Clayton, NC., and San Diego.  We do not have centers in L.A. or San Francisco." This answer was misleading because Ojala failed to state that CUTTER's largest and first plasma center was located at Arizona State Penitentiary. CUTTER also had a center at the Las Vegas Prison. Ojala and CUTTER were well aware of the CDC's and FDA's concern over use of prison plasma, due to homosexual practices and drug abuse in the prison donor population. Many of CUTTER'S centers were in inner city areas frequented by IV drug abusers, such as downtown Oakland, California. CUTTER had also used plasma from centers which targeted known homosexuals. In August 1982, CUTTER quarantined plasma from the Valley Medical Center, a center which targeted known homosexuals, because a donor was hospitalized with full blown AIDS. The plasma was intended for factor concentrate and HBIG production, but was not used because it had thawed on the way to the processing plant. Upon receiving a report of this incident from CUTTER, the FDA indicated a recall might have been necessary if the plasma had been incorporated into factor concentrate final product. Ojala omitted any mention of these facts and circumstances in his response to Dr. Kasper regarding the location of their plasma centers. (CUTTER memorandum dated January 5, 1983.)

**PARAGRAPH NO. 75 ANSWER:**  Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 75, and therefore denies them.

76.     On January 14, 1983, Rodell and the other responsible heads from Defendants attended a meeting of the National Hemophilia Foundation ("NHF").  The purpose of the meeting was to have Defendants explain to the NHF what steps they were prepared to take to safeguard the plasma supply from potential AIDS transmitters. Defendants were very concerned that the NHF would insist on a recommendation that HBc testing be implemented, consistent

with the CDC recommendation 10 days earlier. BAXTER, under Rodell's supervision, had already conducted a survey of several of their donor centers to determine how many donors they would lose if the test were implemented. BAXTER had decided that up to 16% of their donors would not pass the test. Further, BAXTER'S high-titered immunoglobulin donors would be eliminated. In order to defer an NHF recommendation that HBc be used, Rodell told NHF officials that surrogate testing was in the "R and D," or "Research and Development," stage currently. Rodell concealed the fact that the CDC had strongly recommended use of the HBc antibody test as a screening device for donors at high risk for AIDS transmission.. The HBc antibody test was not in the "R and D" stage, and was suitable for use as a screening device for high risk AIDS and Hepatitis C donors. In fact, the HBc test had been approved in 1979 by the FDA as a diagnostic test to be used to ascertain a history of previous hepatitis B infection, and as a screening device for blood and plasma donors. The test had the capability of identifying donors with a history of viral hepatitis. Donors with a hepatitis history were specifically prohibited pursuant to the federal regulations (21 C.F.R. § 640.63). Rodell acknowledged that implementation of the HBc test would eliminate high-titered immunoglobulin donors, but failed to disclose that opposition to use of the test was based on economic rather than safety concerns.

**PARAGRAPH NO. 76 ANSWER:** Aventis denies the allegations of paragraph 76, and

specifically denies that it ever processed or sold factor concentrates.

77.    At the January 14, 1983 meeting, ALPHA, CUTTER, and BAXTER concealed their advertising in publications distributed among urban homosexuals, for the specific purpose of attracting them to plasma centers which supplied high titered plasma to the Defendants. CUTTER and ALPHA concealed their extensive use of prison plasma, and BAXTER discussed plans to phase out prison plasma during the coming year. However, none of the Defendants revealed their "gentlemen's agreement" with the FDA to discontinue use of these plasma sources immediately. CUTTER Memorandum dated January 17, 1983.

**PARAGRAPH NO. 77 ANSWER:** To the extent paragraph 77 is construed as factual

allegations directed to Aventis, they are denied. Aventis specifically denies that it ever

processed or sold factor concentrates. Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 77 which are not directed to Aventis, and

therefore denies them.

78.    On or about December 15, 1983, Rodell, then the head of ARMOUR, told members of the federal Blood Product Advisory Committee (BPAC) and FDA officials that Defendants wanted a three-month deferral in implementation of any recommendations by the BPAC or FDA that HBc testing be required for plasma donors. Rodell told the FDA that the purpose of the deferral was to prepare a response to the proposed recommendation. In fact, Defendants had agreed to seek the three-month hiatus as a "delaying tactic" to avoid

implementing the test, and the request for a deferral was made in bad faith.  (CUTTER
memorandum dated December 13, 1983.)

**PARAGRAPH NO. 78 ANSWER:**  Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 78, and therefore denies them.  Aventis

specifically denies that it ever processed or sold factor concentrates.

79.    It was strongly suggested by the CDC on July 27, 1982 that AIDS had a
viral etiology similar to Hepatitis B because of the risk groups involved. These risk groups
comprised a substantial portion of CUTTER'S plasma donor sources. CUTTER took no
meaningful action to screen out donors at the highest risk for AIDS and Hepatitis C transmission
at any time during the epidemic. In fact, they continued to market products containing plasma
form these groups throughout 1982, 1983, and 1984 worldwide. Even more egregiously,
CUTTER and other Defendants continued to market high-risk non-heat treated factor concentrate
abroad after ceasing sales of such product in the United States in favor of vastly safer heat
treated product.

**PARAGRAPH NO. 79 ANSWER:**  Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 79 which are not directed to Aventis, and

therefore denies them.  Aventis specifically denies that it ever processed or sold factor

concentrates.

80.    Defendants, jointly and individually, fraudulently misrepresented the risk
of AIDS and Hepatitis C due to factor concentrates, failed to disclose accurate warnings of the
risk to Plaintiff or his physicians, and fraudulently purported to be doing "everything possible" to
improve safety, when in fact Defendants maximized the risk by recruiting high-risk donors and
by resisting and obstructing HBc testing, heat treatment, and other measures that would truly
have reduced the risk.

**PARAGRAPH NO. 80 ANSWER:**  Aventis denies the allegations of paragraph 80, and

specifically denies that it ever processed or sold factor concentrates.

H.    **Defendants' Activities Were Subject to Applicable Federal Regulations,
      Which Evidence the Standard of Care With Which Defendants Should Have
      Complied**

81.    Blood derivatives such as Factor VIII and IX are prescription biologicals
subject to federal regulation as both "biological products" and "drugs." Public Health Service
Act, "Regulation of Biological Products," 42 U.S.C § 262; Food, Drug & Cosmetic Act
("FDCA"), 21 U.S.C.  § 301, *et seq*.  (2005).

(a)     21 U.S.C. § 331(b) prohibited and continues to prohibit "adulteration or misbranding of any . . . drug . . . ."

(b)     21 U.S.C. § 351(a)(2)(B) provided and continues to provide that "[a] drug. . . shall be deemed to be adulterated . . . if . . . the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety. . . ."

(c)     21 U.S.C. § 352 provided and continues to provide that "[a] drug…shall be deemed to be misbranded . . . if its labeling is false or misleading in any particular."

(d)     21 U.S.C. § 352(f)(2) provided and continues to provide that a drug shall be deemed to be "misbranded" unless its labeling bears "adequate warnings against use. . . where its use may be dangerous to health."

(e)     21 U.S.C. § 352(n) provided and continues to provide that a drug shall be deemed to be "misbranded" unless the labeling included information concerning side effects and contraindications as required in federal regulations.

(f)     21 U.S.C. § 321 (n) provided and continues to provide that if an article is alleged to be misbranded because the labeling or advertising is misleading, then the determination of whether the labeling or advertising is misleading shall take into account "not only representations made or suggested" by affirmative statements, "but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use" of the drug.

**PARAGRAPH NO. 81 ANSWER:** Aventis admits that paragraph 81(a)-(f) contains some accurate partial quotes of the cited regulations in effect in 1978 through 1990 and currently, but denies that paragraph 81(a)-(f) accurately characterizes the regulations from which it purports to quote. Aventis denies the remaining allegations of paragraph 81.

82.     At all times material to this Complaint, 21 C.F.R. § 201.57(e) provided and continues to provide as follows, with respect to information to be provided with the sale of Defendants' products:

Warnings: Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association with a drug; a causal relationship need not have been proved.

30

**PARAGRAPH NO. 82 ANSWER:** Aventis denies the allegations of paragraph 82. Aventis

specifically denies that the cited regulation existed at all times material to plaintiff's complaint,

and specifically denies that the regulation applied to the sale of factor concentrates when it did

exist.

83.    At all times material to this Complaint, 21 C.F.R. § 200.5 provided and
continues to provide as follows:

> Manufacturers and distributors of drugs and the Food and Drug
> Administration occasionally are required to mail important
> information about drugs to physicians and others responsible for
> patient care. In the public interest, such mail shall be distinctive in
> appearance so that it will be promptly recognized and read.

**PARAGRAPH NO. 83 ANSWER:** Aventis admits that paragraph 83 contains an accurate

partial quote of the cited regulation in effect in 1978 through 1990 and currently. Aventis denies

the remaining allegations of paragraph 83.

84.    At all times material to this Complaint, Part 606 of 21 C.F.R. set forth and
continues to set forth "Current Good Manufacturing Practices" for biological products generally,
and 21 C.F.R. § 640, *et seq.*, set forth additional good manufacturing practices for blood and
plasma biologicals.

**PARAGRAPH NO. 84 ANSWER:** Aventis admits that in 1978 through 1990 and currently,

part 606 of 21 C.F.R. was titled "Current Good Manufacturing Practices for Blood and Blood

Components" and Part 640 of 21 C.F.R. was titled "Additional Standards for Human Blood and

Blood Products." Aventis denies the remaining allegations of paragraph 84.

85.    At all times material to this Complaint, 21 C.F.R. § 606.140(a) provided
and continues to provide:

> Laboratory control procedures shall include: The establishment of
> scientifically sound and appropriate specifications, standards and
> test procedures to assure that blood and blood components are safe,
> pure, potent and effective.

**PARAGRAPH NO. 85 ANSWER:**  Aventis admits that paragraph 85 contains an accurate

quote of 21 C.F.R. §606.140(a), in effect in 1978 through 1990 and currently.  Aventis denies the

remaining allegations of paragraph 85.

> 86.    At all times material to this Complaint, 21 C.F.R.  § 640.60 defined and
continues to define "Source Plasma" as:

> > the fluid portion of human blood collected by plasmapheresis
> > intended as source material for further manufacturing use.

**PARAGRAPH NO. 86 ANSWER:**  Aventis admits that paragraph 86 contains an accurate

partial quote of the cited regulation in effect in 1978 through 1990 and currently.  Aventis denies

the remaining allegations of paragraph 86.

> 87.    At all times material to this Complaint, 21 C.F.R.  § 640.63(c), (1999),
titled Qualification of Donor provided and continues to provide as follows with respect to donors
of source plasma:

> > Donors shall be in good health on the day of donation, as indicated
> > in part by: . . . . (9) freedom from any disease, other than malaria,
> > transmissible by blood transfusion, in so far as can be determined
> > by history and examination indicated in this section; (10) freedom
> > of the arms and forearms from skin punctures or scars indicative of
> > addiction to self-injected narcotics; (11) freedom from a history of
> > viral hepatitis; (12) freedom from a history of close contact within
> > six months of donation with an individual having viral
> > hepatitis; . . . .

Further, 21 C.F.R.  § 640.63(a) provided and continues to provide that the method of determining
"suitability of a donor" included "tests" as well as the taking of a history and physical
examination.

**PARAGRAPH NO. 87 ANSWER:**  Aventis admits that paragraph 87 contains an accurate

partial quote of 21 C.F.R. §640.63(c), in effect in 1978 through 1990 and currently.  Aventis

denies that paragraph 87 accurately characterizes 21 C.F.R. § 640.63 (c) and denies the

remaining allegations of paragraph 87.

> 88.    The foregoing statutes and regulations are evidence of the standard of care
Defendants should have employed in the manufacture and sale of Factor VIII and Factor IX.

Defendants violated the foregoing regulations and/or failed to comply with applicable standards of care by: (a) marketing "adulterated" products that were unsafe as a result of failure to comply with "Current Good Manufacturing Practice"; (b) marketing "misbranded" products that were misleading and failed to disclose or warn of health dangers; (c) failing to warn of serious adverse reactions and potential safety hazards as soon as there was reasonable evidence of an association with the product; (d) failing to exclude intravenous drug users who were unsuitable donors; (e) failing to exclude donors with a history of viral hepatitis who were unsuitable donors; (f) affirmatively seeking out unsuitable donors known to have viral hepatitis antibodies, as well as prison populations known to include substantial numbers of intravenous drug users, for inclusion of their plasma in the pools used to make Factor VIII and Factor IX; (g) failing to disclose their use of dangerous donors; and (h) failing to use appropriate tests and/or procedures to assure their products were safe.

**PARAGRAPH NO. 88 ANSWER:**  Aventis admits that the cited statutes and regulations are, in

part, evidence of the standard of care at the time they were in effect.  Aventis denies the

remaining allegations of paragraph 88, and specifically denies that it ever processed or sold

factor concentrates.  Aventis lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 88 which are not directed to Aventis, and therefore denies

them.

## I.    **Conspiracy, Concert of Action and Group Liability**

89.    Defendants, and each of them, acted in concert and participated in a conscious and deliberate conspiracy to act negligently, fraudulently and with willful and wanton disregard for the rights and safety of blood product users, in connection with the manufacture of Factor VIII and IX blood products and the collection of constituent plasma.

**PARAGRAPH NO. 89 ANSWER:**  Aventis denies the allegations of paragraph 89, and

specifically denies that it ever processed or sold factor concentrates.

90.    Defendants herein tacitly and explicitly agreed to avoid upgrading industry standards.  For example, the technology to virally inactivate factor concentrates existed in the early 1970s, but was not seriously investigated by any of the Defendants until the early 1980s, despite its effective use in Europe.  Use of the HBc antibody test to eliminate Hepatitis B carrier donors, and to identify donors with a history of viral hepatitis, was known science by 1978.  The HBc test was reported to be an effective surrogate test for both AIDS and NANB Hepatitis carriers by 1982, yet no Defendant implemented this test until April 1984.

**PARAGRAPH NO. 90 ANSWER:**  Aventis denies the allegations of paragraph 90, and

specifically denies that it ever processed or sold factor concentrates.

91.     Defendants used donors from predominantly homosexual donor centers, prisons, and inner city areas where the risk of IV drug abuse was high.  After July 1982, when the results of this conduct culminated in reports of fatal immune suppression in three people with hemophilia who infused the product, this concert of action took on a more overt, active form.

**PARAGRAPH NO. 91 ANSWER:**  Aventis lacks knowledge or information sufficient to form

a belief as to the truth of the allegations of paragraph 91 which are not directed to Aventis, and

therefore denies them.  To the extent paragraph 91 is construed to state factual allegations

directed to Aventis, they are denied.  Aventis specifically denies that it ever processed or sold

factor concentrates.

92.     By December 1982, the FDA demanded that Defendants stop using prisoners, donors from high-risk areas for hepatitis and AIDS transmission, and known homosexuals.  Rather than use good faith efforts to comply with the FDA's requests, Defendants collectively argued for a far less onerous and less effective donor screening program.  At a January 6, 1983 meeting of Defendants' trade association, the Biological Section of the Pharmaceutical Manufacturer's Association ("PMA"), Defendants agreed not to implement highly effective HBc donor screening, instead selecting ineffective donor questionnaires that did little to screen out donors at high risk for AIDS transmission.  Defendants further agreed to keep each other informed as to what they were doing in order that a low standard of care was maintained. HBc testing had been strongly suggested by the CDC at the January 4, 1983 Public Health Service ("PHS") meeting. On January 4, 1983, Defendants acted jointly to persuade the National Hemophilia Foundation ("NHF") not to advocate surrogate testing for AIDS and Hepatitis C through implementation of the HBc test. Defendants persuaded the NHF that use of the HBc test was in the "R and D" stage and not practically to implement at that time.

**PARAGRAPH NO. 92 ANSWER:**  Aventis denies the allegations of paragraph 92 directed to

Aventis, and specifically denies that it ever processed or sold factor concentrates.  Aventis lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 92 which are not directed to Aventis, and therefore denies them.

93.     Defendants jointly agreed to oppose recall of products beginning at the January 6, 1983 meeting at the Pharmaceutical Manufacturers' Association ("PMA"). Beginning with this meeting and continuing through at least July 19, 1983, Defendants met at various times to prepare a strategy to prevent the FDA from advocating a far-reaching recall of factor

concentrate products. Defendants knew that due to their high-risk donor populations, and their combining of these donors in pools of 5,000 to 40,000, their products were contaminated with the AIDS agent. Nevertheless, Defendants acted in concert to lobby the FDA to issue recommendations to limit recalls to circumstances in which an identified donor had died of AIDS within a specified time after the pooling of that donor's plasma. Defendants were well aware that plasma from contaminated asymptomatic donors were mixed in the plasma pools and contaminated virtually all lots. Defendants were successful in deferring any FDA Blood Products Advisory Committee ("BPAC") recommendation for a general recall of the product at the July 19, 1983 BPAC meeting. This joint action allowed Defendants to avoid ever recalling any product except when a donor died of AIDS.

**PARAGRAPH NO. 93 ANSWER:**  Aventis denies the allegations of paragraph 93, and

specifically denies that it ever processed or sold factor concentrates.

94.    Defendants conducted a meeting on or about January 6, 1983 at the PMA, a major purpose of which was to decide on a unified strategy to deal with increasing knowledge of risk of AIDS. At the meeting Defendants agreed to postpone submitting any request to the FDA for permission to amend their warning labels or package inserts. They further agreed not to apply to the FDA for warnings enhancements until the other three companies agreed to make application for warning enhancements and to make the warnings similar in content. At the time of the meeting, Defendants had been informed by various reliable health authorities, including the PHS, that there was evidence of an association of risk between factor concentrate use and the transmission of AIDS.

**PARAGRAPH NO. 94 ANSWER:**  Aventis denies the allegations of paragraph 94, and

specifically denies that it ever processed or sold factor concentrates.

95.    On December 13, 1983, Stephen Ojala, CUTTER's responsible head, documented by written memorandum that Defendants met and jointly agreed to propose a "study" of the HBc surrogate screening test, as a "delaying tactic" to avoid implementing the HBc test.

**PARAGRAPH NO. 95 ANSWER:**  Aventis denies the allegations of paragraph 95, and

specifically denies that it ever processed or sold factor concentrates.

96.    Thereafter, at various times throughout 1983-1985, Defendants attended meetings or otherwise communicated to assure joint efforts to avoid recalling their products; to avoid warning patients of the true risk; to boost marketing of their product when sales dropped due to information in the lay press related to AIDS transmission through factor concentrates; to avoid recall of their non-heat treated products after heat-treated products were available; to avoid implementation of the HBc test; and to coordinate a joint legal defense plan in anticipation of litigation from patients infected by AIDS through use of their products.  Defendants also operated through trade organizations, such as ABRA and PMA, to issue public statements

minimizing the risk of AIDS and Hepatitis C and over promoting [*sic*] the benefits of factor concentrate, and to carry out the abovementioned goals of all Defendants.

**PARAGRAPH NO. 96 ANSWER:**  Aventis denies the allegations of paragraph 96, and

specifically denies that it ever processed or sold factor concentrates.

97.    All of the Defendants likely to have caused the harm to Plaintiff are parties to this lawsuit and properly before the court.

**PARAGRAPH NO. 97 ANSWER:**  Aventis denies the allegations of paragraph 97, and

specifically denies that it ever processed or sold factor concentrates.

98.    The conduct of each and all of the Defendants, with respect to their Factor VIII and Factor IX products and related plasma collection methods, was tortious.

**PARAGRAPH NO. 98 ANSWER:**  Aventis denies the allegations of paragraph 98, and

specifically denies that it ever processed or sold factor concentrates.

99.    The harm which has been caused to Plaintiff resulted from the conduct of one, or various combinations of the Defendants, and, through no fault of Plaintiff, there may be uncertainty as to which one or combination of Defendants caused the harm.

**PARAGRAPH NO. 99 ANSWER:**  Aventis denies the allegations of paragraph 99.

100.    The burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by the Plaintiff.

**PARAGRAPH NO. 100 ANSWER:**  Aventis denies the allegations of paragraph 100.

101.    AHF was manufactured using the same fractionation method by all Defendants.  Therefore, during the relevant years 1975 through 1985, non-heat treated factor concentrates were a fungible product, and physicians prescribed the products interchangeably without regard to brand names of the drugs.

**PARAGRAPH NO. 101 ANSWER:**  Aventis denies the allegations of paragraph 101, and

specifically denies that it ever processed or sold factor concentrates.

102.    The non-heat treated factor concentrates manufactured by Defendants from 1975 until 1985 contained the same design flaws.  These products were manufactured from paid donor plasma, which was at highest risk for Hepatitis B, Hepatitis C, and HIV viral transmission.  In addition, the products were made from large pools consisting of 5,000 to 40,000 paid donors, which further magnified the risk of viral transmission.

**PARAGRAPH NO. 102 ANSWER:**  Aventis denies the allegations of paragraph 102, and

specifically denies that it ever processed or sold factor concentrates.

> 103.    In addition, Defendants' factor concentrate products were similarly misbranded. All of the products failed to warn of the known risks enumerated in this complaint.

**PARAGRAPH NO. 103 ANSWER:**  Aventis denies the allegations of paragraph 103, and

specifically denies that it ever processed or sold factor concentrates.

## V.    TOLLING OF APPLICABLE STATUTES OF LIMITATION

> 104.    Any and all potentially applicable statutes of limitations have been tolled by Defendants' affirmative and intentional acts of fraudulent conduct, concealment, and misrepresentation, alleged above, which estop Defendants from asserting statutes of limitation. Such acts include but are not limited to intentionally covering up and refusing to disclose use of high-risk plasma; selling products known to be contaminated; suppressing and subverting medical and scientific research; and failing to disclose and suppressing information concerning the risks of HIV and HCV transmission from Defendants' contaminated factor concentrate. For example, while the spread of AIDS in homosexuals and IV drug users became known to the FDA and the public, only Defendants knew that these very populations were the donors Defendants were targeting to obtain plasma for their factor concentrate products.

**PARAGRAPH NO. 104 ANSWER:**  Aventis denies the allegations of paragraph 104, and

specifically denies that it ever processed or sold factor concentrates.

> 105.    Defendants are estopped from relying on any statutes of limitation because of their fraudulent concealment and misrepresentation alleged above.  Defendants were under a duty to disclose the precise risks of HIV and HCV transmission from their contaminated factor concentrate because this is nonpublic information over which they had exclusive control, because Defendants knew this information was not readily available to people with hemophilia like Plaintiff, and because this information was relevant to people with hemophilia in deciding whether to use Defendants' factor concentrate.

**PARAGRAPH NO. 105 ANSWER:**  Aventis denies the allegations of paragraph 105, and

specifically denies that it ever processed or sold factor concentrates.

> 106.    Until very recently, Plaintiff had no knowledge that Defendants were engaged in much of the wrongdoing alleged herein.  Because of the fraudulent and active concealment of the wrongdoing by Defendants, including but not limited to deliberate efforts—which continue to this day—to give Plaintiff the materially false impression that Defendants undertook all feasible safety precautions to reduce the risk of HIV and HCV transmission from

their contaminated factor concentrates, Plaintiff could not reasonably have discovered the wrongdoing any time prior to this time, nor could Plaintiff have, as a practical matter, taken legally effective action given the unavailability, until very recently, of internal memoranda and other documents (as generally described herein) as evidence in support of Plaintiff's claims. Defendants still refuse to admit and continue to conceal their wrongdoing, and therefore Defendants' acts of fraudulent concealment and misrepresentation continue through the present time.

**PARAGRAPH NO. 106 ANSWER:** Aventis denies the allegations of paragraph 106.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### FRAUDULENT OMISSION AND CONCEALMENT

107.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further alleges as follows:

**PARAGRAPH NO. 107 ANSWER:** In response, Aventis incorporates its responses to all

previous paragraphs as if fully set forth herein.

108.    Defendants had a confidential and special relationship with Plaintiff due to (a) Defendants' vastly superior knowledge of the health and safety risks relating to Factor VIII and Factor IX; (b) Defendants' sole and/or superior knowledge of their dangerous and irresponsible plasma collection practices; and (c) Defendants' direct communications with the hemophiliac community through newsletters that purported to accurately convey the risk of AIDS.  As a result, Defendants had an affirmative duty to fully and adequately warn the hemophiliac community, including Plaintiff and physicians, of the true health and safety risks related to their Factor VIII and Factor IX blood products and constituent plasma, and a duty to disclose their dangerous and irresponsible plasma collection practices.  Independent of any special relationship of confidence or trust, Defendants had a duty not to conceal the dangers of their products to Plaintiff and his physicians.

**PARAGRAPH NO. 108 ANSWER:** Aventis denies the allegations of paragraph 108, and

specifically denies that it ever processed or sold factor concentrates.

109.    Misrepresentations made by Defendants about the health and safety of their factor concentrate products independently imposed a duty upon Defendants to fully and accurately disclose to the hemophiliac community, including Plaintiff and physicians, the true health and safety risks related to Factor VIII and Factor IX and its constituent plasma, and a duty to disclose their dangerous and irresponsible plasma collection practices.

**PARAGRAPH NO. 109 ANSWER:**  Aventis denies the allegations of paragraph 109, and

specifically denies that it ever processed or sold factor concentrates.

110.    In connection with their Factor VIII and Factor IX products, Defendants fraudulently and intentionally concealed important and material health and safety product risk information from Plaintiff, the hemophiliac community, and treating physicians, all as alleged in this Complaint.

**PARAGRAPH NO. 110 ANSWER:**  Aventis denies the allegations of paragraph 110.

111.    Any of the following is sufficient to independently establish Defendants' liability for fraudulent omission and/or concealment:

a.    Defendants fraudulently concealed the health and safety hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with their Factor VIII and Factor IX blood products and related plasma collection activities;

b.    Defendants fraudulently concealed their practice of using unsuitable plasma from unsuitable donors in the manufacture of their Factor VIII and Factor IX blood products;

c.    Defendants fraudulently concealed their practice of avoiding the use of available technology to detect viruses in Defendants' blood products and the components thereof;

d.    Defendants fraudulently concealed their practice of avoiding the use of available technology to destroy viruses in Defendants' blood products and the components thereof;

e.    Defendants fraudulently concealed information about the known comparative risks and benefits of the use of Factor VIII and Factor IX and the relative benefits and availability of alternate products and therapies.

**PARAGRAPH NO. 111 ANSWER:**  Aventis denies the allegations of paragraph 111(a)-(e),

and specifically denies that it ever processed or sold factor concentrates.

112.    Defendants knew that Plaintiff, the hemophiliac community, and his physicians would regard the matters Defendants concealed to be important in determining their course of treatment, including their decision of whether to use Factor VIII and/or Factor IX blood products.

**PARAGRAPH NO. 112 ANSWER:**  Aventis denies the allegations of paragraph 112, and

specifically denies that it ever processed or sold factor concentrates.

113.    As a direct and proximate result of Defendants' fraudulent concealment and suppression of material health and safety risks relating to Factor VIII and Factor IX and of Defendants' dangerous and irresponsible plasma collection practices, Plaintiff has suffered and will continue to suffer injury, harm and economic loss.  As the direct, producing, proximate and legal result of the Defendants' fraudulent concealment and suppression of material health and safety risks relating to Factor VIII and Factor IX and of Defendants' dangerous and irresponsible plasma collection practices, Plaintiff has been injured and has incurred damages, including but not limited to permanent physical injuries to his person, medical and hospital expenses in the past, past disability, past loss of use of the body, and past physical and mental pain and suffering; and will incur in the future medical and hospital expenses, permanent disability, future loss of use of the body, future physical and mental pain and suffering, and loss of life and loss of the enjoyment of life.

**PARAGRAPH NO. 113 ANSWER:**  Aventis denies the allegations of paragraph 113, and

specifically denies that it ever processed or sold factor concentrates.

114.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

**PARAGRAPH NO. 114 ANSWER:**  Aventis denies the allegations of paragraph 114.

115.    Defendants' conduct, as alleged above, was malicious, intentional and outrageous and constituted willful and wanton disregard for the rights or safety of others.  Such conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

**PARAGRAPH NO. 115 ANSWER:**  Aventis denies the allegations of paragraph 115.  Aventis

specifically denies that it engaged in any misconduct.

116.    Plaintiff is informed and believes that Defendants utilize retention policies that provide for scheduled destruction of documents and other items, which may result in the knowing, negligent, or inadvertent destruction of documents, data, and materials relevant and necessary to adjudication of this action, including, but not limited to, records identifying batch or lot numbers of Defendants' products shipped to particular treatment facilities abroad, which may facilitate product tracing.  This risk warrants an order from this Court that such evidence (including all documents, data compilations, and tangible things within the meaning of Rule 26 of the Federal Rules of Civil Procedure) be preserved and maintained for use in these proceedings.

**PARAGRAPH NO. 116 ANSWER:**  Aventis admits that the allegations of plaintiff's complaint are based on events that occurred decades ago and documents related to those events are difficult to locate and may no longer exist.  Aventis denies that plaintiff can meet the requisite showing to obtain an order as described in paragraph 116.

## SECOND CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTY

118.    [1]Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further alleges as follows:

**PARAGRAPH NO. 118 ANSWER:**  In response, Aventis incorporates its responses to all previous paragraphs as if fully set forth herein.

119.    Defendants' factor concentrate products were intentionally designed, manufactured, promoted, distributed and sold to be introduced into the human body.

**PARAGRAPH NO. 119 ANSWER:**  Aventis admits that factor concentrates are prescription biologics that are designed to be administered through intravenous infusion, and are available only upon prescription by a licensed physician.  Aventis denies all remaining or inconsistent allegations of paragraph 119, and specifically denies that it ever processed or sold factor concentrates.

120.    Defendants breached the implied warranties of merchantability and fitness because Defendants' factor concentrate products cannot pass without objection in the trade, are unsafe, are not merchantable, are unfit for their ordinary use when sold, and are not adequately packaged and labeled.

**PARAGRAPH NO. 120 ANSWER:**  Aventis denies the allegations of paragraph 120, and specifically denies that it ever processed or sold factor concentrates.

---

[1] Paragraphs 117-138 are erroneously numbered 118-139 in the Complaint due to the fact that the Complaint skipped number 117.  For consistency, Defendants have repeated the numbering in Plaintiff's Complaint.

## THIRD CLAIM FOR RELIEF

## NEGLIGENCE

121.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further alleges as follows:

**PARAGRAPH NO. 121 ANSWER:**  In response, Aventis incorporates its responses to all

previous paragraphs as if fully set forth herein.

122.    Defendants marketed their Factor VIII and/or Factor IX blood products to and for the benefit of Plaintiff, and knew or should have known that Plaintiff would use their Factor VIII and/or Factor IX blood products.

**PARAGRAPH NO. 122 ANSWER:**  Aventis denies the allegations of paragraph 122, and

specifically denies that it ever processed or sold factor concentrates.

123.    Defendants owed Plaintiff duties to exercise reasonable or ordinary care under the circumstances in light of the generally recognized and prevailing best scientific knowledge.

**PARAGRAPH NO. 123 ANSWER:**  Aventis denies the allegations of paragraph 123, and

specifically denies that it ever processed or sold factor concentrates.  By way of further response,

Aventis states that it has at all times complied with all applicable duties.

124.    Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, the Defendants breached their duty to Plaintiff.  The following sub-paragraphs summarize Defendants' breaches of duties to Plaintiff and describe categories of acts or omissions constituting breaches of duties by Defendants;  each and/or any of these acts or omissions establishes an independent basis for Defendants' liability in negligence:

a.    Failure to exercise reasonable care in producing Factor VIII and Factor IX blood products that were free of viruses, including the HIV virus that causes AIDS and the HCV virus that causes Hepatitis C;

a.      [2]Failure to exercise reasonable care in assuring that only suitable plasma would be used in manufacturing their Factor VIII and Factor IX blood products;

b.      Failure to exercise reasonable care in testing plasma used in manufacturing their Factor VIII and Factor IX blood products for viral contamination;

c.      Failure to exercise reasonable care in recruiting and screening donors of plasma used in manufacturing their Factor VIII and Factor IX blood products;

d.      Failure to reasonably employ anti-viral techniques, including heat treatment, in the manufacture of their Factor VIII and Factor IX blood products;

e.      Unreasonable over promotion of their Factor VIII and Factor IX blood products;

f.      Understating the relative value of hemophilia treatments that constituted alternatives to their Factor VIII and Factor IX blood products;

g.      Failure to warn physicians, Plaintiff, and the hemophiliac community of the dangers associated with their Factor VIII and Factor IX blood products and/or the viruses and foreign bodies contained within the plasma used in manufacturing their Factor VIII and Factor IX blood products;

h.      Failure to exercise reasonable care by complying with federal regulations then applicable to plasma collection and the manufacture of Factor VIII and Factor IX blood products;

i.      Failure to exercise reasonable care in disseminating information about their methods of manufacturing their Factor VIII and Factor IX blood products and the risks that were created by said methods; and

j.      Failure to exercise reasonable care in recalling their Factor VIII and Factor IX blood products.

**PARAGRAPH NO. 124 ANSWER:**  Aventis denies the allegations of paragraph 124(a)-(j), and

specifically denies that it ever processed or sold factor concentrates.

---

[2] Sub-paragraphs 124b-124k are erroneously numbered 124a-124j in the Complaint due to the fact that the Complaint contains two sub-paragraphs 124a.  For consistency, Defendant has repeated the numbering in Plaintiff's Complaint.

125.    Defendants knew, or should have known, that due to their failure to use reasonable care, Plaintiff and other people with hemophilia would use and did use Defendants' Factor VIII and/or Factor IX products to the detriment of their health, safety and well-being.

**PARAGRAPH NO. 125 ANSWER:**  Aventis denies the allegations of paragraph 125, and

specifically denies that it ever processed or sold factor concentrates.

126.    As the direct, producing, proximate and legal result of the Defendants' negligence, Plaintiff has been injured and has incurred damages, including but not limited to permanent physical injuries to his person, medical and hospital expenses in the past, past disability, past loss of use of the body, and past physical and mental pain and suffering; and will incur in the future medical and hospital expenses, permanent disability, future loss of use of the body, future physical and mental pain and suffering, and loss of life and loss of the enjoyment of life.

**PARAGRAPH NO. 126 ANSWER:**  Aventis denies the allegations of paragraph 126, and

specifically denies that it ever processed or sold factor concentrates.

127.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

**PARAGRAPH NO. 127 ANSWER:**  Aventis denies the allegations of paragraph 127.

128.    Defendants' conduct, as alleged above, was malicious, intentional and outrageous, and constituted willful and wanton disregard for the rights or safety of others.  Such conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

**PARAGRAPH NO. 128 ANSWER:**  Aventis denies the allegations of paragraph 128, and

specifically denies that it ever processed or sold factor concentrates.

## FOURTH CLAIM FOR RELIEF

## NEGLIGENCE PER SE

129.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further alleges as follows:

**PARAGRAPH NO. 129 ANSWER:**  In response, Aventis incorporates its responses to all

previous paragraphs as if fully set forth herein.

130.    Defendants violated applicable federal statutes and regulations relating to prescription drugs.  Plaintiff is a person whom these statutes and regulations were meant to protect.

**PARAGRAPH NO. 130 ANSWER:**  Aventis denies the allegations of paragraph 130, and

specifically denies that it ever processed or sold factor concentrates.

131.    Defendants' violation of these statutes or regulations constitutes negligence per se.

**PARAGRAPH NO. 131 ANSWER:**  Aventis denies the allegations of paragraph 131, and

specifically denies that it ever processed or sold factor concentrates.

132.    Defendants' violation of these statutes or regulations was the direct, producing, proximate and legal cause of Plaintiff's injuries and damages.  As the direct, producing and legal result of the Defendants' negligence, Plaintiff has been injured and has incurred damages, including but not limited to permanent physical injuries to his person, medical and hospital expenses in the past, past disability, past loss of use of the body, and past physical and mental pain and suffering; and will incur in the future medical and hospital expenses, permanent disability, fixture [*sic*] loss of use of the body, future physical and mental pain and suffering, and loss of life and loss of the enjoyment of life.

**PARAGRAPH NO. 132 ANSWER:**  Aventis denies the allegations of paragraph 132.

133.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

**PARAGRAPH NO. 133 ANSWER:**  Aventis denies the allegations of paragraph 133.

134.    Defendants' conduct, as alleged above, was malicious, intentional and outrageous and constituted willful and wanton disregard for the rights or safety of others.  Such conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

**PARAGRAPH NO. 134 ANSWER:**  Aventis denies the allegations of paragraph 134.

**VII.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

**ANSWER:**  Aventis denies that there is any legal or factual basis to support a judgment

against it.

135.     For compensatory damages sustained by Plaintiff against all Defendants, jointly and severally, in an amount to be determined at trial;

**PARAGRAPH NO. 135 ANSWER:**  Aventis denies that there is any legal or factual basis

which entitles Plaintiff to recover compensatory damages against Aventis.

136.     For punitive and exemplary damages according to proof against all Defendants;

**PARAGRAPH NO. 136 ANSWER:**  Aventis denies that there is any legal or factual basis

which entitles Plaintiff to recover punitive or exemplary damages against Aventis.

137.     For an award of prejudgment interest, costs, disbursements and reasonable attorneys' fees;

**PARAGRAPH NO. 137 ANSWER:**  Aventis denies that there is any legal or factual basis

which entitles Plaintiff to recover prejudgment interest, costs, disbursements or reasonable

attorneys' fees against Aventis.

138.     For injunctive relief in the form of an order requiring Defendants to preserve all relevant documents; and

**PARAGRAPH NO. 138 ANSWER:**  Aventis denies that there is any legal or factual basis

which entitles Plaintiff to an order requiring Defendants to preserve all relevant documents.

139.     For such other and further relief as the Court deems equitable or appropriate under the circumstances.

**PARAGRAPH NO. 139 ANSWER:**  Aventis denies that there is any legal or factual basis

which entitles Plaintiff to any other or further relief against Aventis.

WHEREFORE, Defendant Aventis prays that plaintiff's Complaint against it be

dismissed; that Armour be granted its costs, fees, and expenses incurred herein; and that Aventis

be granted such other relief as the Court may deem just and proper.

## ADDITIONAL DEFENSES

1.      The Complaint and each and every allegation therein fail to state a claim upon which relief may be granted against Aventis.

2.      Plaintiff's claims against Aventis are barred by the applicable statute of limitations and/or statute of repose in that they were not commenced within the time prescribed by law.

3.      This Court is neither a proper nor convenient forum for the just adjudication of plaintiff's claims.

4.      The injuries and damages claimed by plaintiff, if any, were caused in whole or in part by the acts or omissions of persons other than Aventis, over whom Aventis had no control. Any recovery by plaintiff should be apportioned in direct proportion to such fault in accordance with applicable law, including 740 ILCS § 100/3.

5.      Plaintiff's claims are barred by the law of Brazil, and are as such barred in this Court by principles of comity.

6.      The Complaint, and each cause of action purportedly alleged against Aventis, are barred, in whole or in part, by plaintiff's failure to join indispensable parties.

7.      Plaintiff and plaintiff's agents, including plaintiff's physicians, knew and appreciated the risks complained of in the Complaint and knowingly and voluntarily assumed such risks, so that any recovery by plaintiff is barred or should be reduced in accordance with applicable law.

8.      Because factor concentrates are prescription biologicals available only upon the prescription of a licensed physician, the claims in the Complaint against Aventis are barred in whole or in part by the learned intermediary doctrine.

9.      The claims in the Complaint against Aventis are barred in whole or in part by federal law pursuant to the Supremacy Clause of the United States Constitution because of the federal regulation and licensing of the collection of plasma and of the processing and distribution of factor concentrates, including but not limited to 42 U.S.C. § 262 and 21 C.F.R. part 600. The claims in the Complaint against Aventis are preempted by such regulations, as well as by the laws and regulations of the countries which licensed or otherwise made available factor concentrates to plaintiff.

10.     At all relevant times, any factor concentrate processed and distributed by Aventis was processed and distributed in accordance with the applicable state of the art and in a reasonable and prudent manner based upon available medical and scientific knowledge and further was processed and distributed in accordance with and pursuant to all applicable regulations.

11.     The claims in the Complaint against Aventis are barred in whole or in part by common law or statute and by the applicable blood shield statutes, including 745 ILCS § 40/2.

12.     The alleged damages or injuries were the result of unavoidable circumstances that could not have been prevented by any person, including Aventis.

13.     Plaintiff's claims for liability without proof of specific causation have no applicability under the facts and circumstances of the Complaint or under the applicable law.

14. The injuries and damages claimed by plaintiff, if any, resulted from an intervening or superseding cause and/or causes, and any action on the part of Aventis was not the proximate and/or competent producing cause of such alleged injuries.

15.     The claims in the Complaint against Aventis are barred by laches, waiver, and/or estoppel.

16.    The Complaint fails to state a claim against Aventis upon which relief may be granted for punitive or exemplary damages.

17.    To the extent that the claims in the Complaint are based on any theory providing for liability without proof of causation by Aventis, no such theory has any application under the facts and circumstances of the Complaint under the applicable law, including 745 ILCS § 40/2. In addition, application of any such theory would violate Aventis's rights under the United States Constitution or the applicable State Constitution.

18.    To the extent plaintiff's allegations refer to or are premised on matters involving HIV and/or AIDS, they are irrelevant to plaintiff's claims and accordingly should be stricken.

19.    Any risk associated with any alleged use of Aventis's factor concentrates was unavoidable and/or was outweighed by the benefits of factor concentrate.

20.    Aventis reserves its right to make a written election of credit for settlements under the applicable law. Aventis further demands that its fault and/or responsibility be compared to other parties and non-parties to this suit as provided by any governing statutory or common-law scheme of comparative fault, comparative responsibility and contribution.

21.    The Complaint fails to state a claim for "willful," "malicious," or "outrageous" conduct against Aventis for which relief may be granted.

22.    The alleged injuries or damages of plaintiff were not caused by Aventis, but by the acts of plaintiff or by factor concentrate which was not processed, distributed, sold, supplied, or in any manner associated with Aventis.

23.    Aventis has not knowingly or intentionally waived any applicable affirmative defenses, and asserts all defenses available under the law of Brazil. Aventis reserves the right to

assert and rely upon such other defenses as may become available or apparent during discovery proceedings or as may be raised or asserted by other defendants in this case.

Dated:  December 18th, 2007                    Respectfully Submitted,

                                               SIDLEY AUSTIN LLP


                                               By:  s/ Tamar Kelber
                                                    _____

                                                        Sara J. Gourley
                                                        Tamar B. Kelber
                                                        Susan M. Razzano
                                                        One South Dearborn
                                                        Chicago, IL 60603
                                                        Telephone: (312) 853-7000
                                                        Facsimile: (312) 853-7036
                                                        Attorneys for Defendant
                                                        Aventis LLC

## JURY DEMAND

ARMOUR PHARMACEUTICAL COMPANY hereby demands a jury trial on all issues so triable in this action.


Dated:  December 18, 2007                    Respectfully Submitted,

                                             SIDLEY AUSTIN LLP



                                       By:  s/ Tamar Kelber
                                            _____

                                            Sara J. Gourley
                                            Tamar B. Kelber
                                            Susan M. Razzano
                                            One South Dearborn
                                            Chicago, IL 60603
                                            Telephone: (312) 853-7000
                                            Facsimile: (312) 853-7036
                                            Attorneys for Defendant
                                            Aventis LLC

CERTIFICATE OF SERVICE

     I hereby certify that on the 18th day of December, 2007, I caused to be served a true and correct copy of the foregoing document by Federal Express overnight, postage prepaid on the following counsel of record:


Elizabeth J. Cabraser
Richard M. Heimann
Morris A. Ratner
Lexi J. Hazam
Alexandra L. Foote
LIEFF, CABRASER, HEIMANN &
BERNSTEIN LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111

Sheldon J. Schlesinger
John Uustal
SHELDON J. SCHLESINGER, P.A.
1212 Southeast Third Avenue
Fort Lauderdale, FL 33316


Richard Berkman
David Walk
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

Lindley J. Brenza
Kaspar J. Stoffelmayr
BARTLIT, BECK, HERMAN,
PALENCHAR & SCOTT
1899 Wynkoop Street, 8th Floor
Denver, Colorado, 80202


Kevin Stack
KNAPP, PETERSEN & CLARKE
500 North Brand Boulevard, 20th Floor
Glendale, CA 91203

Geoffrey R.W. Smith
GEOFFREY SMITH, PLLC
1350 I Street, N.W., Suite 900
Washington, DC 20005


                                            _____ s/ Tamar Kelber _____